Corina SAENZ and Felipe
Saenz, Jr., Petitioners

v.

FIDELITY & GUARANTY INSURANCE
UNDERWRITERS and Gisela
Armstrong, Respondents.

No. D–4561.

Supreme Court of Texas.

Argued Nov. 15, 1994.

Decided June 14, 1996.

Rehearing Overruled Aug. 16, 1996.

Ramon Garcia, Dalinda G. Quintana, Edinburg, Thomas Black, Boerne, James P. Wallace, Austin, W. Charles Campbell, San Antonio, for Petitioners.

W. Wendell Hall, San Antonio, Ben Taylor, Dallas, for Respondents.

HECHT, Justice, delivered the opinion of the Court in which GONZALEZ, ENOCH, BAKER and ABBOTT, Justices, joined.

Corina Saenz sued her employer's workers' compensation carrier and its adjuster for wrongfully inducing her to settle her claim and recovered actual damages for future medical costs and mental anguish, and punitive damages. We hold that Saenz' sole remedy for loss of medical benefits is rescission, that she did not adduce any evidence of mental anguish, and that because she is not entitled to actual damages, she is not entitled to punitive damages. Inasmuch as Saenz expressly disclaims rescission, we render judgment that she take nothing.

## I

Saenz had been working as a secretary for about two months when she fell over backward in a chair and hit her head on the floor. Saenz, then thirty-three years old, was hospitalized for several days. After being released, she continued to see numerous

physicians for chronic headaches, drowsiness, seizures, and other ailments resulting from her accident. She has been diagnosed as having post-concussion syndrome, for which she may require medical treatment indefinitely.

The workers' compensation carrier for Saenz' employer, Fidelity & Guaranty Insurance Underwriters, promptly began paying her weekly wage benefits as well as her medical bills. During the next year, Fidelity's adjuster, Gisela Armstrong, had many conversations with Saenz in an effort to settle her claim. Saenz repeatedly told Armstrong that her primary concern was that the medical expenses related to her injury be paid for the rest of her life. The Texas Workers' Compensation Act provides for this benefit. TEX. LAB.CODE § 408.021(a)(formerly TEX.REV.CIV. STAT. ANN. art. 8306, § 7 (Vernon Supp.1995)). Armstrong never told Saenz that she might be entitled to lifetime medical coverage for her injury. Saenz contends that Armstrong told her that workers' compensation would cover medical expenses for only five years. Armstrong denies that she ever said that.

Saenz did not have legal counsel. According to Saenz, Armstrong did not attempt to dissuade her from hiring a lawyer, but Armstrong did say that Saenz did not need a lawyer because she would not receive any more in settlement of her claim. Saenz had made two prior claims for workers' compensation. Each time she was represented by an attorney, and each time she settled for less than five years' medical benefits and a lump sum payment, of which her attorney was paid twenty-five percent. Saenz did not want to incur this legal expense again if it would make no difference in the size of a settlement, and she says Armstrong assured her it would not.

A lawyer for Fidelity wrote Armstrong that Saenz' claim was "a potentially dangerous case in the valley", where "juries tend to be very liberal". He believed Saenz' positive electroencephalogram indicated that her physical complaints were "legitimate", and he urged Armstrong to work out "a reasonable settlement ... without scaring the claimant off to an attorney." Armstrong, however, was unable to reach an agreement with Saenz.

Fidelity scheduled a prehearing conference before an Industrial Accident Board hearing examiner to attempt to resolve Saenz' claim. Present at the conference were Saenz and her husband, another lawyer for Fidelity, and the IAB hearing examiner. Fidelity's lawyer stated that he offered Saenz three alternative settlements: a lump sum payment of $45,000 and twenty years' medical coverage, $60,000 and ten years' coverage, or $65,000 and five years' coverage. Saenz recalls only the last offer, which she accepted. Fidelity's lawyer told Saenz that she had received "a pretty good settlement" and "probably couldn't do any better". Neither he nor the hearing examiner told Saenz that she might be entitled to lifetime medical benefits. The parties signed a compromise settlement agreement before they left the hearing.

Taking into account what Fidelity had already paid Saenz in weekly benefits, the lump sum it agreed to pay Saenz was some $10,000 more than the discounted value of all the weekly benefits Saenz would have been paid if she were totally and permanently disabled. Fidelity's lawyer testified that this was the largest settlement offer he had ever made to a workers' compensation claimant. The hearing examiner, who had started with the IAB nearly twenty years earlier; who had, in his words, "probably held from 75 to 100 prehearings per week for decades", totaling "tens of thousands of hearings"; and who had worked as an investigator and paralegal in a law firm well known in the State for its representation of plaintiffs in workers' compensation and personal injury cases, testified that he "had never seen a compromise settlement agreement that high", and that he had "never seen one that high since." All in all, he thought the "case was settled fairly and in the best interest" of Saenz. The Executive Director of the IAB testified that when he later reviewed and approved Saenz' settlement he believed her "claim was overpaid."

Following the hearing, Fidelity's lawyer reported to Armstrong that he had settled the claim, which he regarded as "very serious" and "very dangerous". While the cash

payment was high, he stated that "the limitation of five years' of medical on this case will be very important." He added that "by settling the case at this time, we avoid the possibility that this lady's condition could deteriorate and eventually result in a condition of imbecility which would cause us to pay statutory lifetime compensation benefits in addition to lifetime medical benefits."

Several months after the settlement was concluded, Saenz called Fidelity's office and asked for copies of her medical records. The records Fidelity sent included the two letters from Fidelity's lawyers, from which we have quoted. Saenz contends that in reading those letters she learned for the first time that she had been entitled to medical treatment for her injury for the rest of her life.

Two years later, Saenz sued Fidelity in Hidalgo County for damages for bad faith and for violations of the Deceptive Trade Practices—Consumer Protection Act, TEX. BUS. & COM.CODE §§ 17.41–.63, and Article 21.21 of the Insurance Code. Saenz later amended her pleadings to name Armstrong as a defendant, to add a claim for fraud, and to request rescission of the settlement agreement. At trial, Saenz stressed her claim for fraud but did not pursue a claim for rescission. The jury found that Armstrong's fraud, which was ratified by Fidelity, and Fidelity's own bad faith caused Saenz to suffer damages of $50,000 for past mental anguish, $200,000 for future mental anguish, and $500,000 for future medical costs. The jury also found that Fidelity and Armstrong had been consciously indifferent to Saenz' rights, and that exemplary damages of $4 million should be assessed against Fidelity, and $250,000 against Armstrong. The district court rendered judgment on the verdict for all damages found by the jury.

The court of appeals en banc, with two justices dissenting, affirmed the award of mental anguish damages for fraud and punitive damages against Armstrong. The court reversed the award of punitive damages against Fidelity because it found no evidence that Fidelity had ratified Armstrong's actions. The court also reversed the award for future medical expenses because the evidence showed that those expenses would be attributable to Saenz' injury and not to the fraud. However, the court remanded the case to the district court to consider rescission of the settlement agreement in light of the finding of future medical expenses. 865 S.W.2d 103, 114. The court did not address the finding of bad faith.

All parties have applied to this Court for writ of error.

## II

Fidelity and Armstrong contend that they did not wrong Saenz in any way. We focus on their arguments concerning the damages awarded Saenz, but before we do so, we must address Saenz' contention that the court of appeals' decision is invalid because it was not agreed to by a majority of the justices who participated in it.

This case was argued before a panel of three justices of the Thirteenth Court of Appeals. While the case was under submission, the court decided to consider it en banc without re-argument. The Thirteenth Court of Appeals consists of a chief justice and five justices. TEX. GOV'T CODE § 22.216(m). When the opinion and judgment in this case issued, however, Chief Justice Paul Nye had retired and one of the justices, Justice Robert R. Seerden, had been appointed chief justice, leaving a vacancy on the court that had not been filled. The opinion of the court does not indicate who participated in the decision, other than its author and the two dissenting justices, and specifically whether former Chief Justice Nye participated. Neither does the judgment. The division of the court may have been 3–2 or 4–2. Eight days later the vacancy on the court was filled by appointment of a new justice, Justice Linda Reyna Yañez.

All parties moved for rehearing. On November 30, 1993, the clerk of the court of appeals sent counsel a letter which stated in substance:

> The appellants' motions for rehearing ... were this day OVERRULED with Justice Yañez dissenting. Justice Yañez' dissenting opinion will follow. In addition, the appellees' motion for oral argument en banc was denied by this Court on this date.

The next day the clerk sent counsel another letter which stated in part:

> Please disregard this Court's letter dated November 30, 1993. The appellants' and appellees' motions for rehearing in the above cause were OVERRULED with Justice Yañez dissenting on November 30, 1993. Justice Yañez' dissenting opinion will follow. In addition, the appellees' motion for oral argument en banc was denied by this Court on November 30, 1993.

These letters indicate that Justice Yañez voted to grant the motions for rehearing, but neither suggests whether any other member of the court joined her. A justice may dissent from an opinion and nevertheless vote to deny a motion for rehearing by the party he argued should have prevailed.

Saenz' counsel responded by letter dated January 13, 1994, which read in part as follows:

> The attorneys for the Appellee Saenz in this cause are somewhat confused about the status of the cause. . . .

> There are two matters that need clarification. First, are the original two dissenting justices still dissenting from the court's judgment? Second, what is the nature of Justice Yañez's dissent? Is she dissenting from that portion of the opinion favorable to Appellees or is her dissent along the same lines as the [earlier dissent]?

A week later the clerk of the court sent counsel the following letter:

> Enclosed please find a copy of the dissenting opinion on motion for rehearing in the above-referenced cause.

> In response to [counsel's] letter dated January 13, 1994, please be advised that the original two dissenting justices are still dissenting from the Court's judgment. In response to the second question, please refer to Justice Yañez' dissenting opinion.

Justice Yañez' opinion states that "there is no majority to grant or deny the appellees' motion for rehearing", that she would grant the motion, and that she joins in the earlier dissent. 878 S.W.2d 605, 605. She added:

> [T]his Court denies the appellant's motion for rehearing en banc by a deadlocked vote, and the Court's judgment is entered with three justices in the majority and three justices dissenting. Moreover, the number of justices voting to grant a motion for rehearing en banc exactly equals the number voting to deny, and the parties will be denied their rehearing en banc. *Id.*

Saenz then filed a "second motion for rehearing and to resolve deadlock", arguing that because of Justice Yañez' dissent, the court was deadlocked on its original decision and judgment. The court denied Saenz' motion.

Saenz argues that a majority of the members the court of appeals did not join in its opinion and judgment or in its denial of her motion for rehearing, and therefore both those decisions are invalid by constitutional provision, statute, and rule. Specifically, Article V, Section 6 of the Texas Constitution states:

> The Court of Appeals may sit in sections as authorized by law. The concurrence of a majority of the justice sitting in a section is necessary to decide a case.

Section 22.223(b) of the Government Code states:

> When convened en banc, a majority of the membership of the court constitutes a quorum and the concurrence of a majority of the court sitting en banc is necessary for a decision.

And Rule 79(d) of the Texas Rules of Appellate Procedure states:

> Where a case is submitted to an en banc court, whether on motion for rehearing or otherwise, a majority of the membership of the court shall constitute a quorum and the concurrence of a majority of the court sitting en banc shall be necessary to a decision. If a majority of the justices of the court sitting en banc cannot concur in a decision because they are equally divided, such fact shall be certified to the Chief Justice of the Supreme Court who may temporarily assign a justice of another court of appeals or a qualified retired justice to participate in the decision of the case pursuant to law. The reconstituted en banc court may order the case reargued, at its discretion.

We do not agree that a majority of the members of the en banc court did not join in its opinion and judgment. Undisputedly, a majority of the court—either three of five or four of six—joined in the opinion. The judgment issued the same day. The later addition of a new justice of the court could not disturb the earlier vote unless the court agreed to rehear the case.

The only indication that a majority of the court did not vote to deny the motions for rehearing is found in Justice Yañez' dissent. Ordinarily, a dissent does not represent the views of the court. Assuming, however, that the court was deadlocked on whether to grant either of the motions for rehearing, as Justice Yañez' dissent indicates it was, we do not believe a majority vote on a motion for rehearing is necessary for the motion to be denied. A motion for rehearing is rather obviously not "a case", within the meaning of the constitutional provision, that can be decided only by a majority of the group making the decision. Nor do we think a ruling on a motion for rehearing is "a decision" within the meaning of the statute and rule. Those provisions, too, we think, refer to a decision on the merits of a case. The granting of a motion for rehearing does not always mean a change in the court's decision in the case. Appellate courts often grant rehearings to clarify or modify opinions without changing the outcome of the case. Even after rehearing is granted, a majority must still concur in any new decision in the case. By the same token, a denial of a motion for rehearing does not reaffirm the decision. A justice may vote to deny a motion for rehearing even if he or she did not concur in the court's opinion and judgment.

A contrary rule would not be practical. Votes on non-dispositive motions, like motions for rehearing or for rehearing en banc, are evenly divided often enough that to appoint tie-breakers in each instance would be burdensome. Moreover, if the tie-breaker were not also appointed to rehear the merits of the case, the situation would become even more confused. We do not think the statute or the rule intended such situations. Rather, we think that if the vote on a motion for rehearing or motion for rehearing en banc is evenly divided, there is no "decision" within the meaning of the Section 22.223(b) and Rule 79, and the motion fails.

Accordingly, we conclude that the opinion and judgment of the court of appeals were rendered by a majority of the members participating, and that the motions for rehearing were properly overruled. We turn now to the parties' arguments on damages.

### III

We consider first the award of damages for future medical expenses, and then the award of mental anguish damages.

### A

A person who is fraudulently induced to settle a workers' compensation claim cannot recover as damages in a lawsuit the value of the benefits she would have been entitled to but for the settlement; her sole remedy is rescission of the settlement agreement and reassertion of her compensation claim. *Brannon v. Pacific Employers Ins. Co.,* 148 Tex. 289, 224 S.W.2d 466, 468 (1949); *Traders & Gen. Ins. Co. v. Bailey,* 127 Tex. 322, 94 S.W.2d 134, 135 (1936); *Commercial Casualty Ins. Co. v. Hilton,* 126 Tex. 497, 87 S.W.2d 1081, 1083 (1935). The reason for this rule is that the Workers' Compensation Act vests the power to award compensation benefits solely in the Workers' Compensation Commission (formerly the Industrial Accident Board), subject to judicial review. *Brannon,* 224 S.W.2d at 468; *Bailey,* 94 S.W.2d at 135; *Hilton,* 87 S.W.2d at 1083; *see* Tex. Lab.Code §§ 408.001, 410.168–.169, 410.203–.205, 410.208. Allowing courts to award damages for wrongful deprivation of benefits would circumvent the Commission's jurisdiction.

Saenz concedes that this is the law but argues that it does not preclude her recovery of damages for fraud and bad faith. Saenz is right, of course, as long as the damages are not for lost compensation benefits. She claims the damages for future medical care are for fraud, as the jury found, and are not lost benefits.

It is true that the jury found $500,000 damages for future medical costs unrelated

to Saenz' head injury. The jury was asked to find the "[r]easonable costs of future medical care reasonably required by Corina Saenz *after April 8, 1992* [the date of the compromise settlement agreement] *as a result of the injury in question."* (Emphasis added.) The "injury in question" was not defined, but the jury was instructed:

> Do not include any amount for any condition existing before or not resulting from the settlement of Plaintiff, Corina Saenz', workers' compensation claim.

> You are instructed that her injury of February 6, 1986, is a condition existing before and not resulting from the settlement of her workers' compensation claim.

The instructions make plain that the jury was to find the future medical costs that Saenz would incur as a result of Fidelity's wrongfully inducing her to settle, not as a result of her head injury.

However, there was absolutely no evidence at trial that Saenz had incurred or would ever incur any medical costs as a result of Fidelity's wrongful conduct. Fidelity's fraud and bad faith did not cause Saenz any physical injury for which she would ever need medical care. The only evidence of future medical expenses was for continued treatment of Saenz' head injury. Thus there is no evidence to support the jury's answer to the verdict.

Saenz was not entitled to recover as damages the cost of future medical care for her head injury that workers' compensation benefits might have covered had she not settled her claim. Her sole means of obtaining those benefits was to rescind the settlement agreement and reassert her claim before the Commission. As the court of appeals noted, Saenz pleaded for rescission as an alternative to damages but did not make the same request on appeal. The appeals court nevertheless remanded the case for the trial court to consider rescission. Saenz now complains that this was error. In her application for writ of error she states: "This is not a suit ... to set aside a compromise settlement agreement under cases like *Brannon v. Pacific Employers Ins. Co.,* 148 Tex. 289, 224 S.W.2d 466 (1949). Instead, this is a suit solely to recover common law tort damages

for fraud and for breach of the duty of good faith and fair dealing." In her response to Fidelity's application Saenz reiterates: "Saenz' claim is not ... a *Brannon* claim." "A remand of any kind ... would be erroneous." At oral argument, Saenz' counsel explained:

> The court of appeals also erred in that it reversed the case and remanded to the trial court for a new hearing on setting aside that compromise settlement agreement, the CSA. This case is not now, it never has been, and it never will be a case under the Compensation Act. This is a case of common law fraud and bad faith of the insurance company in the way it treated its insured. There were no pleadings in the trial court to support a setting aside of that CSA. There was no idea, no request, on the part of the plaintiff. That's one point that both sides here before you today agree on: that the court was just flat in error in remanding that part of the case to the trial court to set aside that CSA.

Saenz may not want rescission because of the size of her settlement with Fidelity. Fidelity paid Saenz a lump sum greater than the discounted value of all the weekly benefits she could have recovered. While Fidelity apparently paid as much as it did to limit Saenz' medical coverage to five years, still, as the hearing officer testified, "$65,000 is real big on this case. I've never been involved in anything like that."

But we need not speculate as to Saenz' reasons for not requesting rescission. The fact is that she has not done so and has even complained that the court of appeals remanded for consideration of rescission. We agree with her that the court of appeals erred.

Because Saenz is not entitled to damages for medical care for her head injury, and there is no evidence that any wrongful conduct of Fidelity or Armstrong caused injury requiring medical care, we hold that the trial court erred in awarding Saenz damages for future medical expenses.

**B**

■  The jury found that Saenz suffered damages of $50,000 for past mental anguish

and $200,000 for future mental anguish. The only evidence in a three-day trial to support any recovery for mental anguish is the following testimony by Saenz:

> Q   Can you tell the jury what it is that you were concerned about about this lifetime medical benefits and who was going to wind up paying for the lifetime medical benefits that you were told you were going to incur?
>
> A   I worried about that a lot. My husband was already working two jobs, and I was worried also that we were going to lose our house because when we bought it we had two incomes, and I knew that we couldn't afford the medical bills that we were going to have.

The question does not inquire specifically about Saenz' mental anguish, but this is the only place in the record where Saenz testified about any worries or concerns.

In *Parkway Co. v. Woodruff*, 901 S.W.2d 434 (Tex.1995), we held that mental anguish damages could not be awarded without either "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine", or other evidence of " 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger' ". *Id.* at 444. The two sentences of Saenz' testimony quoted above do not fall into either category. In *Parkway* we held that plaintiffs' concern over the flooding of their home did not entitle them to mental anguish damages. It was not that plaintiffs' concerns were not real or understandable; clearly they were. Plaintiffs proved worry, anxiety, vexation and anger, but failed to prove that their distress involved more than these emotions. Saenz' concern about future medical expenses, while no less real than plaintiffs' concern in *Parkway*, does not rise to the level of compensable mental anguish.

■   Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded. We disagree with the court of appeals that "[t]ranslating mental anguish into dollars is necessarily an arbitrary process for which the jury is given

no guidelines." 865 S.W.2d at 114. While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. Compensation can only be for mental anguish that causes "substantial disruption in ... daily routine" or "a high degree of mental pain and distress". *Parkway*, 901 S.W.2d at 444. There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding. Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both. And the law requires appellate courts to conduct a meaningful evidentiary review of those determinations. One court of appeals has suggested the contrary. *See State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590, 601 (Tex.App.—El Paso 1991, writ denied); *Daylin, Inc. v. Juarez*, 766 S.W.2d 347, 352 (Tex.App.—El Paso 1989, writ denied); *Brown v. Robinson*, 747 S.W.2d 24, 26 (Tex.App.—El Paso 1988, no writ). We disapprove that language in those cases.

There is no evidence in this case that Saenz suffered mental anguish or that $250,000 would be fair and reasonable compensation. Accordingly, the trial court erred in awarding mental anguish damages.

\*   \*   \*   \*   \*   \*

■   Without evidence of actual damages, punitive damages cannot be recovered. Therefore, we need not address whether Saenz could recover punitive damages on the theories alleged and the findings made by the jury. Because Saenz has failed to show entitlement to damages, she cannot recover on any of the theories she has alleged. Therefore, we conclude that the judgments of the lower courts must be reversed and judgment rendered that Saenz take nothing.

PHILLIPS, Chief Justice, filed an opinion, concurring in part and dissenting in part, in which CORNYN and OWEN, joined.

SPECTOR, Justice, filed a dissenting opinion.

PHILLIPS, Chief Justice, joined by CORNYN and OWEN, Justices, concurring in part and dissenting in part.

While I agree with the Court that Corina Saenz cannot recover actual or punitive damages in this case, I disagree that this holding compels us to render judgment that Saenz take nothing. I would instead remand this cause to the trial court in the interest of justice to allow her the option of pursuing the remedy she has previously foregone, that of equitable rescission.

The jury found that Gisela Armstrong, Fidelity's adjuster, fraudulently induced Saenz into executing the compromise settlement agreement. While the Court does not address the issue, there is at least some evidence supporting this finding. Saenz testified that she repeatedly asked Fidelity, through Armstrong, to agree to provide lifetime medical coverage for her head injury.[1] According to Saenz's testimony, Armstrong responded as follows:

Q: During these conversations that you had with her, what did [Armstrong] tell you about your request for lifetime medical?

A: She said that the most that workers comp would pay was five year medical, and that's what they were going to pay.

Q: Did this lady ever tell you that you had the right—well, first of all, were there any discussions about a lawyer?

A: There was, yeah, because I mentioned once maybe I should get a lawyer, and she said—she didn't tell me not to get a lawyer. She just said that I didn't need one because whether I got a lawyer or not, that was—I was going to get the same settlement, but I was going to have to give the lawyer 25 percent.

Saenz reiterated this testimony on cross-examination:

Q: What did [Armstrong] tell you about the medical specifically?

A: When I told her I wanted lifetime medical, she said that the most workmans comp would pay was five years, and that's all they were paying, that's all they were going to pay.

This testimony, viewed in the light most favorable to Saenz, supports the jury's finding that Armstrong misrepresented the scope of benefits available under the Workers' Compensation Act.

As the Court acknowledges, Saenz's only remedy for this fraud is to seek rescission of the compromise settlement agreement and reassert her compensation claim before the Commission. 925 S.W.2d at 612. From the record, it appears that Saenz may be entitled to this remedy. To rescind the agreement, Saenz must establish: 1) that misrepresentations concerning her injuries were made by the employer or compensation carrier; 2) that she relied on those misrepresentations in making the settlement; and 3) that she had a meritorious claim for more compensation than was paid. *See Rodriguez v. American Home Assurance Co.*, 735 S.W.2d 241, 242 (Tex.1987).

Saenz obtained an express finding that Armstrong made fraudulent misrepresentations, satisfying the first element for rescission. The jury also found that Saenz acted in reasonable reliance on Armstrong's misrepresentations. While Saenz did not obtain a jury finding that she had a meritorious claim for additional compensation, there is evidence in the record that would have supported a finding to that effect had she properly presented the issue to the jury.

The jury awarded Saenz $500,000 for future medical care. If this award represented the medical cost of Saenz's on-the-job injury, it clearly would constitute a finding of a meritorious claim for additional compensation. However, I agree with the Court that, under the literal wording of the trial court's

---

**1.** This portion of Saenz's testimony is confirmed by a post-settlement letter from Fidelity's attorneys to Armstrong stating that Saenz had been "stuck on a desire for lifetime medical regardless of the amount of money we were willing to pay."

charge, the $500,000 award could not have been for that injury.

Question 11 and the jury's answers are as follows:

> What sum of money do you find, if any, would fairly and reasonably compensate Corina Saenz for her actual damages, if any, sustained by her by reason of any acts or omissions of Gisela Armstrong?

> You are to consider each element of damages separately so as not to include damages for one element with any other element.

> *Do not include any amount for any condition existing before or not resulting from the settlement of Plaintiff, Corina Saenz's, Workers' Compensation claim.*

> You are instructed that her injury of February 6, 1986, is a condition existing before and not resulting from the settlement of her Workers' Compensation claim.

> Answer separately in dollars and cents, if any, with respect to each of the following elements:

> a. Mental anguish in the past. ($50,000)

> b. Mental anguish that in reasonable probability she will suffer in the future. ($200,000)

> c. Reasonable costs of future medical care reasonably required of Corina Saenz after April 8, 1992 as a result of the injury in question. ($500,000)

(emphasis added). Because this question instructed the jury not to include any amount for any condition existing before the settlement, including Saenz's head injury, we cannot construe question 11(c) as awarding medical costs for that injury.

Saenz's entire case, however, was about recovering the costs of her future medical care for her on-the-job injury. The only evidence presented at trial of future medical costs were those associated with that injury. A rehabilitation consultant, testifying as an expert for Saenz, predicted that these costs would ultimately exceed $1.6 million. Moreover, the threshold date noted in question 11(c)—April 8, 1992—is the date the five year open medical awarded in the settlement terminated. Saenz contended, however, that her damages for future medical care were in

fact *tort damages,* resulting from Fidelity's fraudulent conduct in settling the compensation claim. She necessarily took this position in an attempt to avoid the longstanding rule prohibiting a trial court from awarding compensation benefits that have not been previously determined by the Commission. *See Brannon v. Pac. Employers Ins. Co.,* 148 Tex. 289, 224 S.W.2d 466, 468 (1949); *Texas Employers Ins. Ass'n v. Kennedy,* 135 Tex. 486, 143 S.W.2d 583, 585 (1940). Presumably, this is why question 11 focused on the time period of the fraudulent settlement, instructing the jury not to consider any preceding injury. Saenz's purported tort damages, however, directly corresponded to the lost compensation benefits, i.e., the medical costs for her head injury. It therefore appears that the jury probably intended to award $500,000 for the medical costs of Saenz's head injury, which equates to the amount of lost compensation benefits.

This Court has broad discretion to remand causes to the trial court "if it shall appear that the justice of the cause demands another trial." TEX.R.APP. P. 180. I would exercise this discretion here. It appears that Saenz, in seeking tort damages for her future medical costs, pursued the wrong legal theory, bypassing a potentially meritorious rescission claim. Where it appears from the record that the losing party may be able to recover under some alternative factual or legal theory not pursued at the first trial, we have frequently remanded in the interest of justice. *See, e.g., Texas Real Estate Comm'n v. Nagle,* 767 S.W.2d 691 (Tex.1989) (to allow plaintiff an opportunity to prove a material fact after the Court held that the fact could not be established by collateral estoppel); *Porras v. Craig,* 675 S.W.2d 503 (Tex.1984) (to allow plaintiff to pursue an alternative theory of damages); *Continental Southern Lines, Inc. v. Hilland,* 528 S.W.2d 828 (Tex. 1975) (to allow plaintiff an opportunity to pursue an alternative legal theory); *Mitchim v. Mitchim,* 518 S.W.2d 362 (Tex.1975) (to allow defendant an opportunity to show that jurisdiction under foreign judgment was lacking, after parties had proceeded below under a mistake regarding the burden of proof); *Continental Cas. Co. v. Cook,* 515 S.W.2d 261

(Tex.1974) (to allow plaintiff an opportunity to pursue an alternative theory of good cause for failing to timely file his workers' compensation claim); *Members Mut. Ins. Co. v. Tapp,* 469 S.W.2d 792 (Tex.1971) (to allow plaintiff a second opportunity to prove a key fact, where plaintiff's failure to do so at first trial may have been due to a misunderstanding as to the effect of a trial stipulation); *Houston Fire and Cas. Ins. Co. v. Nichols,* 435 S.W.2d 140 (Tex.1968) (to allow insured an opportunity to prove the value of destroyed property, after the Court held that the policy amount did not constitute an agreement as to value); *C. & R. Transport, Inc. v. Campbell,* 406 S.W.2d 191 (Tex.1966) (where it appeared that the jury may have misunderstood the trial court's charge); *Aetna Ins. Co. v. Klein,* 160 Tex. 61, 325 S.W.2d 376 (1959) (to allow plaintiff an opportunity to put on evidence of the policy amount in an action against his insurer, where this evidence had never been offered at first trial); *City of San Antonio v. Pigeonhole Parking of Texas,* 158 Tex. 318, 311 S.W.2d 218 (1958) (to allow plaintiff an opportunity to prove that ordinance was unconstitutional as applied, after Court held that it was not facially unconstitutional).

As the Court points out, Saenz not only did not ask for rescission in this Court, she also expressly disclaimed this remedy. She may very well have taken this position, however, as a strategic maneuver, attempting to reaffirm the notion that she was seeking tort damages, not lost compensation benefits. In light of the Court's appropriate rejection of this argument, Saenz may now desire to pursue rescission in an attempt to secure long-term medical coverage. While we have the authority to bind Saenz to the legal maneuvering of her lawyers, a better course is to use our discretion under Rule 180 to promote the cause of justice. There is evidence that Saenz has suffered a serious, debilitating injury, for which she may need indefinite medical care. Further, there is evidence, and a jury finding, that Fidelity's adjuster defrauded her out of her right to that care under the Workers' Compensation Act. Under these circumstances, we can and should afford Saenz another trial.

Of course, if Saenz still does not desire to pursue rescission in light of the Court's holdings today, she should not be required to. Instead, she should be allowed to take a nonsuit on remand. I note that, to pursue a claim for rescission of a workers' compensation compromise settlement agreement, Saenz need not return the benefits she has received under the agreement. *See Texas Employers Ins. Ass'n v. Kennedy,* 135 Tex. 486, 143 S.W.2d 583, 585 (1940). Although a party seeking rescission of a contract ordinarily must return, or offer to return, the consideration received under the contract, *id.,* we recognized an exception in *Kennedy* for suits to rescind workers' compensation compromise settlement agreements. We reasoned that the claimant's obligation to prove a meritorious claim for *additional* compensation negated any duty to tender back the benefits already received. *Id.* Of course, if rescission were awarded, Fidelity would be entitled to a credit for amounts already paid against any future award by the Commission. *See id.*

Accordingly, I would reverse the judgment of the court of appeals, rendering judgment that Saenz take nothing on her claims for actual and punitive damages. I would, however, remand the cause to the trial court to allow Saenz the opportunity to pursue a claim for rescission of the compromise settlement agreement.

SPECTOR, Justice, dissenting.

Because I believe that the majority mischaracterizes the damages awarded Saenz by the jury, I respectfully dissent. While recognizing that the "instructions make plain that the jury was to find the future medical costs that Saenz would incur as a result of Fidelity's wrongfully inducing her to settle," 925 S.W.2d 613, the majority nevertheless concludes that Saenz is not entitled to damages because Fidelity's "fraud and bad faith did not cause Saenz any physical injury." *Id.* I believe, however, that Saenz's *uncompensated* future medical expenses were caused by Fidelity's misconduct and, therefore, should be upheld.

Saenz brought an action for common-law fraud and bad faith, not for an increase in

benefits under the Workers' Compensation Act. This is not a rescission claim; instead it is a claim for torts that this Court has recognized exist apart from a claim under the Workers Compensation Act. *See Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 212–13 (Tex.1988). The Act does not cover intentional torts such as fraud and bad faith. *See Aranda*, 748 S.W.2d at 213–14; *Porter v. Downing*, 578 S.W.2d 460, 461 (Tex.Civ. App.—Texarkana 1979, writ ref'd n.r.e.). Saenz's uncompensated future medical expenses should be recoverable as damages for Fidelity's tortious conduct. *See Kneip v. Unitedbank–Victoria*, 734 S.W.2d 130, 134 (Tex.App.—Corpus Christi 1987, no writ).

We first recognized the duty of good faith and fair dealing because the unequal bargaining power between the parties would "allow unscrupulous insurers to take advantage of their insured's misfortunes in bargaining for settlement or resolution of ... claims." *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987). In this case, that is exactly what happened: Recognizing that "[Saenz's] condition could deteriorate and eventually result in a condition of imbecility," Fidelity fraudulently induced Saenz to settle in order to escape the possibility the company could be saddled with "statutory lifetime compensation [and] medical benefits."

I would hold that the Act does not preclude Saenz's damages for uncompensated future medical expenses flowing from Fidelity's tortious conduct. By holding otherwise, the majority leaves injured workers whose workers compensation carriers take advantage of their superior bargaining position with little meaningful recourse. *See* 865 S.W.2d 103, 122 (Hinojosa, J., dissenting). Therefore, I dissent.