Kevin Lowell **DURBAN**, Appellant,

v.

Brenda **GUAJARDO**, Appellee.

No. 05–01–00707–CV.

Court of Appeals of Texas,
Dallas.

May 24, 2002.

---

Thomas P. Earls, Dallas, for Appellant.

Tim M. Wheat, Washington, DC, for Appellee.

Before Justices LAGARDE, MOSELEY, and BRIDGES.

## OPINION

Opinion By Justice LAGARDE.

Kevin Lowell Durban appeals the judgment rendered against him following a jury trial in this personal injury lawsuit brought by Brenda Guajardo. Durban brings six issues questioning the legal and factual sufficiency of the evidence and whether the trial court erred by: (a) denying Durban's motion to disregard the jury's finding that he committed intentional infliction of emotional distress; (b) denying Durban's motion for judgment n.o.v. and motion for new trial concerning exemplary damages; and (c) refusing to order a remittitur for future mental anguish and exemplary damages. We resolve the issues against Durban and affirm the trial court's judgment.

## FACTUAL BACKGROUND

This case involves a physical altercation between Durban and Guajardo on January 27, 2000.[1] On that day, Durban was thirty-nine or forty years old, six feet tall, weighed about 230 pounds, and worked out regularly. Guajardo was twenty-three years old, five feet tall, weighed about 110 pounds, and was an avid runner. Guajardo had run in a marathon several weeks before these events and, even though she

did not train for the marathon, she completed the race. Both parties worked for La Quinta hotels based in Irving, Texas. Durban was a regional vice president, and Guajardo worked in "admin." They met in about August 1998 and had dated for about nine months before January 27. Although they did not live together, Guajardo sometimes spent the night at Durban's apartment.

On January 27, they were attending a national conference for La Quinta at a hotel in Irving. Durban had reserved a hotel room during the conference where he would make telephone calls or rest during conference breaks. At the end of the conference on January 27, Durban and Guajardo went to Durban's room to rest before the evening reception. During the reception, Durban and Guajardo each thought the other was drinking too much. Guajardo thought Durban was giving her jealous looks as she talked to executives whom she used to date, but Durban denied he was jealous. After the reception, Durban and Guajardo returned to Durban's room to get their coats. On the way down in the elevator, Guajardo told Durban she wanted to marry him. Durban either said nothing and nodded his head, or, according to Durban, told her they had been dating only nine months and should "give it some more time." Their stories vary widely from this point.

### Guajardo's Version of Events

Guajardo testified they went to Durban's apartment and got into bed. Guajardo put her arm around Durban and said, "I love you," and Durban said, "Fuck you." Guajardo said, "Kevin, why would you say that? What's going on?" But Durban did not answer. Guajardo got out of bed and went into the living room, crying. She

---

1. Unless otherwise noted, all events took place in 2000.

telephoned to find a friend to pick her up. Guajardo had left her car at work because it was snowing during the day, and she did not know how to drive in the snow.

While Guajardo was trying to reach her friend on her mobile telephone, Durban came out of the bedroom and screamed at Guajardo, "Stop your fucking crying. I'm sick of it." Durban tried to wrest the telephone away from Guajardo. Guajardo would not give Durban the telephone. Durban hit Guajardo in the head and then grabbed her by the hair and started dragging her. "Finally, you know, he was pulling me, and I was struggling like this way and he just kept punching me everywhere." Durban hit her in the arms "and just squeezed, you know, and ripped my arm. I just felt like I was just going everywhere, all over the floor. And I was trying to get my phone. And then finally I—I was just in a lot of pain back here. And you know, I went like this and there was like blood all over from the back of my ear. And, you, I was like crying and screaming, you know, look at what you've done to me, you've cut me, I'm bleeding."

The voice mail button on Guajardo's telephone was accidentally activated, causing the following exchange during the fight to be recorded: "I want you to fucking stop crying, too. I am sick of it. I am sick of this. Just stop fucking crying.... No, no. (Yelling) Please ... (inaudible)."

During the fight, Guajardo shoved Durban's telescope to the floor, knocked his stereo off the bar, and threw a remote control at the door. Durban picked up Guajardo, slammed her to the floor, and knelt on her back with one knee in her neck. As Guajardo's screams became fainter because she could not breathe, Durban told her, "Stop screaming, because the more you scream the less oxygen you have." Guajardo thought she was going to die.

At some point during the fight, Durban told Guajardo she made his life "absolutely miserable" and their relationship was over. Guajardo took some of Durban's photograph albums and a pair of scissors and started cutting up photographs of the two of them on vacations. While Guajardo was cutting up the pictures, Durban telephoned 9-1-1 from his mobile telephone and told the operator they had a fight and he was scared because Guajardo was now armed with a pair of scissors. When the call was cut off, Durban "whopped" Guajardo in the head. Guajardo escaped from the apartment and was running down the hall shouting for help and banging on doors. When she had to pass by Durban's door, Durban grabbed her and tried to pull her into the apartment. Guajardo resisted, but Durban pulled her head into the doorway and trapped her head between the door and the doorjamb. Guajardo managed to escape again and ran downstairs where someone let her into his apartment until the police came. When the police arrived, they took Guajardo home.

### Durban's Version of Events

Durban testified that after he told Guajardo in the hotel elevator he did not want to marry her, Guajardo, who was drunk and loud, started yelling at Durban in the elevator. Durban tried to calm her down. As they drove past their office, Durban asked her if she wanted to get her car, but Guajardo said, "we need to talk about this now, why don't you want to marry me," and she kept yelling at Durban. When they reached Durban's apartment, Guajardo was still yelling at him. Durban told her to be quiet because people were trying to sleep, but Guajardo shouted, "Whoo, whoo, whoo."

In Durban's apartment, Guajardo kept yelling at Durban, "why won't you marry me, you are still in love with Heidi [Dur-

ban's ex-fiancée from Florida]." Durban said they should just go to bed and get some sleep because they both had to work the next day. Guajardo was still angry, but they both got into bed. Guajardo told Durban they should "set a date," and she wanted to know why he did not want to marry her. Durban told her they should discuss it another day. Guajardo said, "no, no, we're going to talk about this right now," and she jumped out of bed and turned on all the lights in the apartment. When Guajardo left the bedroom, Durban got up, closed the bedroom door, turned out the light, and got back into bed.

Guajardo "burst" through the bedroom door, turned on the light, and shouted, "Get up, get up, we are going to talk about it now." Durban followed her into the kitchen. Guajardo asked him, "why won't you marry me, what is wrong with me?" Durban again suggested they go to bed and talk about it the next day. Guajardo swung her left fist at Durban, which he blocked. Guajardo kept hitting Durban and saying, "We need to talk about this now. We need to set a date." Durban said, "don't hit me. Please don't hit me," and he grabbed Guajardo's wrists. Guajardo then kicked Durban repeatedly in the calf and shin. Durban pushed her away from him. Guajardo, "raging, angry," screamed, "don't push me away, don't ever push me away," and she charged at Durban. Durban pushed her away. Guajardo touched her lip and, finding a spot of blood, yelled, "You bastard. You bastard." She went into the bathroom to examine her lip, and Durban followed to help her. Guajardo hit Durban, and he fell down. Guajardo jumped on top of him and hit him. Durban struggled with her, got up, and went back to the living room.

Guajardo followed Durban and punched him in the back. She picked up her mobile telephone and, in a "total rage," made telephone calls for thirty or thirty-five minutes, screaming into the telephone, wailing, and crying. Durban was exasperated because she had been yelling at him since they were at the hotel. He told her he did not want to marry her, and he said, "That's it. That's it. I don't want to see you any more. You want to live your whole life like it's a Jerry Springer show. I don't want to see you any more. You're going home right now."

Durban went to his bedroom to get his keys. As he opened the drawer to get his keys, Guajardo grabbed the drawer, pulled it out of the chest, and threw it against the wall.[2] Durban, shocked by Guajardo's behavior, sat down on the bed. Guajardo charged Durban, knocked him backwards, and grabbed his chest hair. Durban grabbed her hair, pulled her to one side, and got away from her.

In the living room, Guajardo hit Durban in the back, and he grabbed her wrists. Guajardo kicked him, and he pushed her away. Guajardo kicked Durban in the groin, sending him staggering into some filing cabinets. Durban watched as Guajardo picked up a large remote control unit and smashed it repeatedly against the floor until it shattered. Guajardo picked up Durban's telescope. Durban thought she was going to use it to break the sliding glass door, and he grabbed her. Guajardo bit his biceps until he let go of her, and she kicked him in the groin again. She then smashed his telescope against his weight-lifting equipment repeatedly until the telescope broke. She picked up his boom-box stereo, pulled the cords out of the wall, charged at Durban holding the stereo

2. In her testimony, Guajardo denied throwing the drawer across the room when Durban was looking for his keys; she testified she did that while looking for her mobile telephone.

above her head, and smashed it into the floor at his feet.

Guajardo then went to the kitchen, grabbed an "arm load" of Durban's photograph albums and a pair of scissors, and began tearing up photographs and cutting up negatives. She told Durban, "you'll never have any pictures of me, you don't want to see me any more." Durban picked up his mobile telephone and dialed 9-1-1. While he spoke to the operator, Guajardo charged him and hit him. When she stopped hitting him, Durban lowered his hand, and Guajardo poked him in the eye. Durban set down his telephone, and Guajardo picked it up and broke off the antenna. Guajardo then ran out of the apartment beating on doors and yelling, "he's raping me, he's beating me."

Durban called 9-1-1, but the reception was choppy without the antenna. Guajardo threw open the front door of the apartment, screamed "Help, help, help," and went to another apartment. When the police arrived, Durban showed the officers the destruction Guajardo had wreaked in his apartment. The police told Durban to wait in his bedroom while they got Guajardo.

When they brought Guajardo to Durban's apartment, she was still screaming at Durban, "You are still in love with Heidi. Why don't you love me? What is wrong with me? I hate Dallas. I hate the people in Dallas. I hate it here. I want to leave." The police told Guajardo she had to leave Durban's apartment because he did not want her there. Guajardo said, "All you care about is your job and your retirement. You just see what happens to that." As the police led her down the stairs from Durban's apartment, she screamed, "All you care about is your job and your retirement. You just see what happens to that," and she laughed "ha, ha, ha, ha," as she went down the steps. Dur-

ban lost his job shortly thereafter but did receive a severance package.

## Further Events

Guajardo testified that the next day, she "was just throbbing everywhere. My head was hurting a lot. I was uncomfortable." She also lost a lot of hair. She had bruises on her left arm, left forehead, and right cheek; she had welts on her head from being dragged by the hair and punched in the head; she had a "busted" lower lip; her arms were sore; her hip hurt; and everywhere on her head hurt.

On January 28, Guajardo went to a medical clinic. Christie Gibson, a physician's assistant, testified Guajardo had an open wound on her ear requiring suturing. Guajardo had pain in her face, ear, beneath her ear, neck, forearms, feet, and left hip. She also had several nodules on her scalp consistent with being dragged by the hair.

That afternoon, Guajardo met Christie Henkle, Durban's administrative assistant, in the parking lot of the La Quinta offices. Henkle noticed a bandage on Guajardo's ear and asked her what happened. Guajardo told her Durban "had beat the hell out of her." Henkle did not notice anything else wrong with Guajardo's face. Henkle was shocked and could not believe Durban would do such a thing. Henkle testified Guajardo "was upset and didn't know what she was going to do because she loved him."

Jane Gram, Guajardo's friend, testified she saw Guajardo the day after the assault. "She was pretty beaten up. It kind of took my breath away. She had bruises on her face. Her lips were very swollen. She had a cut behind her ear, and blood—dry blood on her head, and hair was falling out. . . . She would just go like that (indicating) and a lot of hair would come out of

her head." Gram testified that Guajardo was very upset, depressed, scared, and timid. Guajardo told Gram she did not know what to do.

On the Monday following the incident, Guajardo met with an investigator and, soon thereafter, an attorney. This case was filed on February 16. The attorney recommended Guajardo see a therapist.

Sandy Gaylord, Guajardo's therapist, testified Guajardo first came to her on February 9. Guajardo had a number of traumatic symptoms from the incident: she was hyper vigilant; sensitive to environmental threat; very terrified, scared, and concerned she would be attacked or hurt further; did not want anybody around her; and suffered nightmares and sleep disturbances. Gaylord testified Guajardo's mental anguish exceeded that suffered in a relationship breakup: simply breaking up a relationship might be stressful, but not traumatic. Gaylord's records on Guajardo for September 27 stated, "Closed. No longer needed." Gaylord testified this entry was made because Guajardo had moved out of the area and not because Guajardo no longer needed therapy. Gaylord stated Guajardo needs further therapy and will, from time to time, relive the experience of January 27 for the rest of her life.

At trial, Guajardo testified about the problems she still suffers from the incident. She testified she has lost the ability to trust others. She finds it exhausting to interact with others. She no longer goes on dates "one-on-one" but only goes on "group dates." When dating, if someone does something "sweet" for her, she wonders what that person is going to do to her. If someone is sincere, "It's like, why are you being sincere, you know, did he put you up to this?" If she sees a red Jeep, she is afraid it is Durban's vehicle. Sometimes, Guajardo sits down and cries

about the incident. Before January 27, Guajardo thought of herself as "the ultimate marathoner"; now she no longer runs or goes to the gym. She still suffers from sleep disturbances.

On December 7, the jury found: (1) Durban assaulted Guajardo; (2) Durban did not falsely imprison Guajardo; (3) Durban intentionally inflicted severe emotional distress on Guajardo; (4) $2000 would compensate Guajardo for past physical pain and mental anguish and $5000 would compensate her for future mental anguish; (5) the harm to Guajardo resulted from malice; and (6) $25,000 exemplary damages should be assessed against Durban. The trial court entered judgment on the verdict on February 2, 2001.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In his first issue, Durban questions whether the trial court erred by denying his motion to disregard the jury's answer to question number 3 finding Durban intentionally inflicted severe emotional distress on Guajardo. Durban also asserts the trial court erred by denying his motion for judgment n.o.v. and his motion for new trial on this ground.

Durban concedes the evidence was sufficient to support submission of all three torts, namely, assault, false imprisonment, and intentional infliction of emotional distress. However, he argues that when the jury answered "yes" to the assault question, the cause of action for intentional infliction of emotional distress became unviable as a matter of law. The supreme court has held "a claim for intentional infliction of emotional distress cannot be maintained when the risk that emotional distress will result is merely incidental to the commission of some other tort." *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex.1998). Durban as-

serts in his brief, "In this case, the primary risk of an assault and battery is physical injury rather than emotional distress." Thus, he argues, the cause of action for intentional infliction for emotional distress cannot be maintained.

Durban's argument depends on his assertion that "the primary risk of an assault and battery is physical injury rather than emotional distress." Durban cites no authority for this assertion. Texas law is contrary to Durban's assertion. Emotional distress is not merely incidental to a claim for assault and battery, it is "the essence" of it. *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 630 (Tex.1967) ("Personal indignity is the essence of an action for battery; and consequently the defendant is liable not only for contacts which do actual physical harm, but also for those which are offensive and insulting."); *see Brown & Root, Inc. v. City of Cities Mun. Util. Dist.*, 721 S.W.2d 881, 884 (Tex. App.-Houston [1st Dist.] 1986, no writ) (mental anguish damages from assault and battery are "self-evident"), *overruled on other grounds by City of Tyler v. Likes*, 962 S.W.2d 489 (Tex.1997). Contrary to Durban's argument, the basis for an assault and battery action is "not the actual harm done to the plaintiff's body." *Fisher*, 424 S.W.2d at 630. Durban's argument lacks merit.

Even if Durban were correct in his argument that a plaintiff cannot recover damages for both assault and battery and intentional infliction of emotional distress, we cannot reverse unless we find the as-

serted error "probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case to the court of appeals." TEX.R.APP. P. 44.1(a). Durban asserts the error harmed him because the damages question did not ask the jury to segregate the damages finding among the different causes of action. In support of this argument, Durban relies on *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex.2000).

In *Casteel*, the trial court submitted a liability question containing thirteen separate grounds for liability and calling for a single answer by the jury, which the jury answered affirmatively. *Id.* at 387. However, five of the grounds for liability involved the DTPA, but the plaintiff did not have standing under the DTPA because he was not a consumer. *Id.* at 387–88. The supreme court held the trial court erred in submitting the five DTPA grounds in the liability question. *Id.* at 388. In considering the harm from the error, the supreme court held "that when a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory." *Id.*

*Casteel* is inapplicable for several reasons. First, as Durban acknowledges, the intentional infliction of emotional distress theory was not invalid when submitted to the jury.[3] Second, Durban failed to

---

**3.** Durban's brief is inconsistent. On page 24 of his brief, Durban argues he had no obligation to object to the charge because the trial court was correct to submit the intentional infliction of emotional distress ground: "Here ... had the defendant objected at the Charge Conference, that objection should have been overruled. It was not until the jury

affirmatively found an assault and battery that Plaintiff's alternative claim of an intentional infliction of severe emotional distress became, as a matter of law, unavailable as a cause of action capable of supporting liability against this defendant." On the very next page of his brief, however, Durban refers to the intentional infliction of emotional distress ground as

preserve any error by making a timely and specific objection to the charge, namely, that the charge should have conditioned the jury's answering the intentional infliction of emotional distress question on a negative answer to the assault and false imprisonment questions. Third, *Casteel* is not applicable when, as in this case, the damages from two causes of action, one valid, the other arguably invalid, are the same. *See Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture,* 50 S.W.3d 531, 549 (Tex.App.-El Paso 2001, no pet.) (citing *Auto. Ins. Co. v. Davila,* 805 S.W.2d 897, 903 (Tex.App.-Corpus Christi 1991, writ denied), *overruled on other grounds by Hines v. Hash,* 843 S.W.2d 464, 470 (Tex.1992)). In this case, Guajardo's damages for assault include all the mental anguish damages she could recover under her cause of action for intentional infliction of emotional distress. Finally, this case was tried on alternative theories of recovery. In this situation, when the jury returns favorable findings on two or more theories of recovery, the plaintiff is entitled to judgment on the theory granting the greatest recovery. *Boyce Iron Works, Inc. v. S.W. Bell Tel. Co.,* 747 S.W.2d 785, 787 (Tex.1988). If one of those theories is declared invalid, then the plaintiff is entitled to recover under the other theory. *Id.* In this case, if the intentional infliction of emotional distress theory is now invalid, Guajardo can still recover on her assault cause of action. Guajardo's assault and intentional infliction of emotional distress claims involve the same acts by Durban, and her damages under the assault cause of action necessarily include the damages under the intentional infliction of emotional distress cause of action.

Because, in this case, the damages for assault include the damages for intentional infliction of emotional distress, we conclude Durban has not shown the trial court reversibly erred by denying his motion to disregard and his motion for judgment n.o.v. We resolve Durban's first issue against him.

## FUTURE MENTAL ANGUISH

In his second issue, Durban questions whether the evidence is legally and factually sufficient to support the jury's finding that $5000 would compensate Guajardo for future mental anguish. In addressing a legal sufficiency or no-evidence challenge, we must consider only the evidence and inferences, viewed in their most favorable light, that support the jury's finding, and we must disregard all evidence and inferences to the contrary. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987); *Alm v. Aluminum Co. of Am.,* 717 S.W.2d 588, 593 (Tex.1986). If there is more than a scintilla of evidence to support the finding, then the no-evidence challenge fails. *Stafford,* 726 S.W.2d at 16. When the evidence offered to prove a vital fact is so weak it does nothing more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 755 (Tex.1970). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is some evidence. *Kindred,* 650 S.W.2d at 63.

"the improperly submitted invalid theory." If the ground was improperly submitted, then Durban waived any error by failing to object. *See El Paso Ref., Inc. v. Scurlock Permian Corp.,* 77 S.W.3d 374, 386 (Tex.App.-El Paso 2002, no pet. h.) ("*Casteel* does not apply until or unless the party seeking reversal and remand for charge error makes a 'timely and specific' objection to the inclusion of the contested question.").

In addressing a factual sufficiency of the evidence challenge to a jury verdict, an appellate court must consider and weigh *all* the evidence, not just the evidence supporting the verdict. *City of Princeton v. Abbott*, 792 S.W.2d 161, 163 (Tex.App.-Dallas 1990, writ denied); *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176; *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985). However, this Court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

Mental anguish is defined as intense pain of body or mind or a high degree of mental suffering. *Tex. Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 394 (Tex.App.-Dallas 2000, pet. denied) (citing *Phar-Mor, Inc. v. Chavira*, 853 S.W.2d 710, 712 (Tex. App.-Houston [1st Dist.] 1993, writ denied)). It is more than disappointment, resentment, or embarrassment. *Id.* To recover for mental anguish, the plaintiff must prove such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, or public humiliation. *Id.* A mental anguish damages award requires evidence of a high degree of mental pain and distress that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Stevens v. Nat'l Educ. Ctrs., Inc.*, 11 S.W.3d 185, 185 (Tex.2000) (per curiam).

Durban argues there is no evidence of future mental anguish because Gaylord's records stated on September 27, "Closed. No longer needed." Gaylord testified this entry was made because Guajardo had moved out of the area and not because Guajardo no longer needed therapy. Gaylord testified Guajardo needs further therapy. Durban's argument lacks merit.

Durban also argues there is no evidence or factually insufficient evidence of future mental anguish. Guajardo, Gram, and Gaylord all testified to the mental anguish Guajardo still suffered. The jury could conclude this anguish would continue for some period of time. Gaylord testified Guajardo would relive the incident from time to time for the rest of her life. We conclude this is some evidence, and factually sufficient evidence, to support the jury's finding of future mental anguish.

Durban also argues the figure of $5000 for future mental anguish is unsupported by the evidence. The jury has discretion in determining the amount of mental anguish damages to award. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996). That discretion is limited, however, and the amount awarded for mental anguish must be supported by evidence that the amount is fair and reasonable. *Id.* In this case, the jury awarded Guajardo $2000 for the mental anguish she suffered during the ten-and-one-half months between the incident and the trial. Durban does not challenge this finding. The evidence showed Guajardo was only twenty-three years old and would "re-live" this incident from time to time for the rest of her life. The jury's decision to award future mental anguish damages only two-and-one-half times the amount awarded for ten-and-one-half months of distress is fair, reasonable, and within the jury's discretion. In *Saenz*, the supreme court held there was no evidence of any mental anguish; thus, the awards of $50,000 for past mental anguish and $200,000 for fu-

ture mental anguish were unsupported by evidence. *Id.* In this case, the jury had evidence of mental anguish, past and future, and the jury awarded a fair and reasonable figure for future mental anguish. We resolve Durban's second issue against him.

## MALICE

In his third issue, Durban questions whether there is legally sufficient clear and convincing evidence that Guajardo's harm resulted from Durban's malice. The jury charge defined "malice" as follows:

"Malice" means[:]

    (a) a specific intent by Kevin Lowell Durban to cause substantial injury to Brenda Guajardo; or

    (b) an act or omission by Kevin Lowell Durban

        (i) which, when viewed objectively from the standpoint of Kevin Lowell Durham [sic] at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

        (ii) of which Kevin Lovell [sic] Durban had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

*See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (Vernon 1997).

■ Durban asserts the evidence shows he used no more force against Guajardo than was reasonably necessary to protect himself and his property, and that he had no intent to injure her. This assertion can be based only on Durban's testimony. In reviewing the legal sufficiency of the evidence, we disregard all evidence contrary to the verdict, such as Durban's testimony, and determine whether the remaining evidence clearly and convincingly shows malice. *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 502 (Tex.2001). In reviewing the factual sufficiency of the evidence, we consider all the evidence, but we give weight to the jury's determination of the credibility of the witnesses. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998).

■ In this case, Guajardo's testimony fully supports the jury's finding that Durban acted with malice. Her testimony shows Durban, without provocation, "beat the hell out of her," dragged her by her hair, trapped her head in a doorway, and choked her. Durban's statement to Guajardo as he knelt on her neck that she would have more oxygen if she stopped screaming shows Durban knew he was choking her and that he intended to choke her. Guajardo's testimony is clear and convincing evidence of "malice" under either definition in the jury charge. The jury chose to believe Guajardo over Durban, and we must respect the jury's decision. We conclude the evidence is legally and factually sufficient to support the jury's finding that Guajardo's harm resulted from Durban's malice. We resolve Durban's third issue against him.

## AMOUNT OF EXEMPLARY DAMAGES

In his fourth and fifth issues, Durban questions whether the evidence is legally and factually sufficient to support the jury's finding of $25,000 exemplary damages. The award of exemplary damages is governed by chapter 41 of the Texas Civil Practice and Remedies Code. "The determination of . . . the amount of exemplary damages to be awarded is within the discretion of the trier of fact." TEX. CIV. PRAC. & REM.CODE ANN. § 41.010(b) (Vernon

1997). "In determining the amount of exemplary damages, the trier of fact shall consider evidence, if any, relating to:

    (1) the nature of the wrong;

    (2) the character of the conduct involved;

    (3) the degree of culpability of the wrongdoer;   ·

    (4) the situation and sensibilities of the parties concerned;

    (5) the extent to which such conduct offends a public sense of justice and propriety; and

    (6) the net worth of the defendant."

*Id.* § 41.011(a). We will consider each of these factors.

The nature of the wrong and the character of the conduct, as found by the jury, were an unprovoked, vicious, violent assault by Durban upon Guajardo. As for the degree of culpability of the wrongdoer, Durban, the jury rejected Durban's testimony that he acted in self-defense; thus, Durban was completely culpable. The situation and sensibilities of the parties were: Durban was six feet tall, weighed 230 pounds, Guajardo was five feet tall, weighed 110 pounds, they were in Durban's apartment, Guajardo was only half-dressed, the temperature outside was below freezing and it was snowing, Guajardo did not have a car available, and Guajardo was emotionally upset because of Durban's

rejection of her marriage proposal and his reaction to her declaration of love. It should go without saying that Durban's conduct, as found by the jury, is offensive in the extreme to the public's sense of justice and propriety. As for the final factor, there is no evidence of Durban's net worth.[4]

The maximum amount of exemplary damages the jury could have awarded was $200,000. *See id.* § 41.008(b)(2) (Vernon Supp.2002). The jury awarded $25,000 exemplary damages.

▆▆▆▆ Durban argues the evidence is legally and factually insufficient because there is no evidence of his net worth. Evidence of a defendant's net worth is relevant in determining the amount of exemplary damages because "the amount of punitive damages necessary to punish and deter wrongful conduct depends on the financial strength of the defendant. That which could be an enormous penalty to one may be but a mere annoyance to another.'" *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 29 (Tex.1994) (quoting *Lunsford v. Morris,* 746 S.W.2d 471, 472 (Tex. 1988) (orig. proceeding), *overruled on other grounds by Walker v. Packer,* 827 S.W.2d 833, 842 (Tex.1992) (orig. proceeding)). Nothing in chapter 41 of the Texas Civil Practice and Remedies Code, *Moriel,* or other Texas case law indicates that evidence of the defendant's net worth is a

---

4. The record shows Guajardo's attorney thought the trial on the amount of exemplary damages would be separate from the trial on the amount of actual damages. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 41.008(a), 41.009 (Vernon 1997 & Supp.2002). During the charge conference, Guajardo's attorney learned the trial would not be bifurcated, and she moved to reopen the evidence to present evidence of Durban's net worth. The trial court denied the motion. Neither Guajardo nor Durban complains on appeal of the lack of bifurcation or the trial court's refusal to reopen the evidence.

During the trial, Guajardo's attorney questioned Durban about his current employment, but he refused to answer any questions concerning his employment because he did not want Guajardo to know where he worked. Durban believed Guajardo would start "following [him] again" and try to interfere with his job. He also refused to tell where he lived at the time of trial. Contrary to Durban's brief, the record does not show that, at the time of trial, "[h]e lived in a one-bedroom apartment in Irving that [Guajardo] had extensively trashed" (citation omitted).

necessary element for the plaintiff to recover any exemplary damages. Instead, it is merely a relevant issue, as relevant to the defendant to prove his low net worth as to the plaintiff to prove the defendant's high net worth. *See City of Fort Worth v. Zimlich,* 975 S.W.2d 399, 411 (Tex.App.-Austin 1998), *rev'd on other grounds,* 29 S.W.3d 62, 72 (Tex.2000);[5] *cf. Tex. Capital Secs., Inc. v. Sandefer,* 58 S.W.3d 760, 774 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (affirming award of exemplary damages despite no evidence of defendant's net worth), *opinion withdrawn in part on motion for reh'g,* 58 S.W.2d at 780. Durban argues, "it is as likely that the $25,000 award was an enormous penalty, as that it was a mere annoyance to this Defendant, the jury simply did not know." If the award was an enormous penalty to Durban, then based on these facts, it was deserved; and if the award was only a mere annoyance, then the lack of evidence of his net worth benefitted him rather than harmed him. Durban's argument lacks merit.

After closely scrutinizing all the evidence, we conclude the evidence is both legally and factually sufficient to support the jury's award of $25,000 in exemplary damages. We resolve Durban's fourth and fifth issues against him.

## REMITTITUR

In his sixth issue, Durban asserts the trial court erred in refusing to order a remittitur because the evidence is legally and factually insufficient to support the awards for future mental anguish and exemplary damages. We have already determined the evidence is legally and factu-

ally sufficient to support these awards. We resolve Durban's sixth issue against him.

We affirm the trial court's judgment.

**5.** The supreme court reversed and rendered on the punitive damages issue because there was no evidence of malice. *Zimlich,* 29 S.W.3d at 72. The court expressly did not reach "the City's arguments that punitive damages were inappropriate because Zimlich failed to adduce any evidence regarding the City's financial condition." *Id.*