Opinion issued April 15, 2010                                                                       



 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-08-00985-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



Osman Mustafa, d/b/a Sam’s
General Trading, Inc. and Shell
Rabbit Lube and Shell Rapid Lube,
Appellant

 

V.

 

Karim Matrut, Appellee

 

 



On Appeal from the 334th District Court

 Harris County,
Texas

Trial Court Cause No. 2006-41985

 

 



MEMORANDUM OPINION

          A
jury found that appellant, Osman Mustafa (“Mustafa”), committed fraud and
awarded appellee, Karim Matrut (“Matrut”), $10,600 in actual damages.  Additionally, the jury found by clear and
convincing evidence that the harm to Matrut was the result of Mustafa’s fraud
and awarded Matrut $75,000 in exemplary damages.  On appeal, Mustafa argues that (1) the trial
court erred in submitting the fraud liability question in broad form; (2) the
trial court erred in awarding damages for fraud relating to failure to pay
wages, which was not pled; (3) the evidence is legally and factually
insufficient to support the finding of liability for the underlying fraud cause
of action; (4) there was not clear and convincing evidence to prove fraud; and
(5) there was not clear and convincing evidence to prove exemplary
damages.  We suggest a remittitur of the
exemplary damage award and otherwise affirm.

Background

Matrut testified that he first met
Mustafa at an Arabic coffee shop.  The
two would see each other frequently at the coffee shop and became friends,
referring to one another as “brother.” 
They were friends for several years prior to working together.  In 2005, Mustafa hired Matrut to work as a
manager in his body shop and perform various jobs such as selling cars and
buying parts.  Under the employment
agreement, Matrut testified that he was to be paid a monthly salary of $2,000
and a commission of $200 for every car he sold. 
Matrut worked for Mustafa for about a year-and-a-half and earned about
$2,500 each month.  Matrut testified that,
several times during his employment, Mustafa requested Matrut loan him money by
allowing him to pay the salary and commission that Matrut had earned at a later
date.  Matrut agreed to make the loan
because he believed that Mustafa would keep his promise to repay the loan and
he felt that he might lose his job if he refused. Matrut testified that he loaned
Mustafa more than $10,600 that was never repaid.  Matrut brought suit to recover $10,600
because he had evidence of three checks from Mustafa totaling that amount that
were never paid.  Matrut did not seek to
recover for additional cash loans he made to Mustafa because he believed he did
not have sufficient proof.

Matrut testified that on February 7,
2006, two checks (numbers 2131 and 2138) were issued to him by Mustafa to repay
the loan.  Each check was written for
$2,500.  Matrut also testified that at
the time Mustafa gave him the two checks, Mustafa represented that he had
sufficient funds to cover the checks.  Nevertheless
both checks were returned for insufficient funds.  Matrut gave Mustafa the checks which had been
stamped “returned/not paid.”  Matrut
testified that Mustafa assured Matrut that he had enough money to repay the
loan and that he should not worry.

Despite the returned checks, Matrut
testified that he continued to work for Mustafa because he trusted him to repay
the loan promised.  Mustafa left the
country for a period of two months and asked Matrut to look after his family
and business. Matrut testified that prior to Mustafa’s departure he again
assured Matrut that he would repay the loan. 
Four months later Mustafa issued Matrut a check for $5,600.  Matrut testified that Mustafa assured him
that there were sufficient funds in the account and the check would be paid.  Matrut took the check directly to the bank
that day but was unable to cash the check because of insufficient funds.  Matrut testified that when he approached
Mustafa about the unpaid $5,600 check, Mustafa told him he had many accounts
and maybe it was a mistake.  Matrut also
testified that Mustafa told him to wait a few days and then Matrut would be
able to get the money.  A few days later,
Matrut took this check back to the bank for payment.   Again, the bank refused to pay the check due
to insufficient funds. 

Matrut testified that although
Mustafa said he would issue a check from another account, after three checks
had been rejected, Matrut no longer trusted Mustafa to keep his promise to
repay the loan.  Matrut quit his job and
demanded that Mustafa repay the money because he needed it to take care of
himself and pay rent on his apartment. 
Matrut testified that Mustafa told him to wait.  After waiting four months, Matrut still had
not received payment for any of the checks. Matrut testified that he again
approached Mustafa about repayment of the loan. Matrut testified that Mustafa
again promised to give him the money but said he had problems with his business
and the bank.  Subsequently, Matrut
brought this suit for fraud to recover the $10,600 owed to him by Mustafa.  

When questioned on cross-examination
about what proof he had of the $10,600 loan, Matrut pointed to the three unpaid
checks.  Matrut asked rhetorically why
Mustafa would write him checks if he was not owed anything.  Matrut admitted he did not have any pay stubs
or records of employment to support his claim but explained he never insisted
their agreements be reduced to writing because he trusted Mustafa as a
brother.  Matrut testified that Mustafa
never intended to go through with his promise to repay the money loaned, as
evidenced by, among other things, the insufficient funds in Mustafa’s accounts
when checks were issued to Matrut. Mustafa’s bank records, which were admitted
at trial, showed that he did not have sufficient funds at the times the three
checks were written.  

At trial, Mustafa offered several
different and somewhat inconsistent explanations of whether he owed any money
to Matrut and why.  First, he denied
owing Matrut $5,000 for the first two checks of $2,500 each.  Mustafa admitted he signed the first two
checks in February 2006 but testified that he signed blank checks so that
Matrut could buy parts for the business, and he denied these checks were repayment
of a loan.  Mustafa testified that he had
several different accounts and would transfer money to cover checks, but at the
time he signed the two checks in February, he was not sure if he had sufficient
funds to cover the amounts. 

Next, regarding the check for $5,600,
Mustafa testified that he signed the check after his secretary wrote it
out.  He further testified that he did
not remember whether he had sufficient funds to cover the check on the date it
was written.  Mustafa testified that he
owned three businesses and had six different accounts and that he would
normally transfer money from the various accounts to cover checks.

Mustafa testified that he fired
Matrut on the same day this check was signed because Matrut’s English was not
very good, he was shouting with a customer, and he smoked cigarettes.  Mustafa testified that the check was made out
for $5,600 because that was the amount Matrut demanded that he be paid, and
Mustafa testified that he “need[ed] to finish with him completely[.]”  He testified that although he gave Matrut the
check so that Matrut would leave the business, he needed to check his accounts
to make sure that was the amount Matrut was truly owed.  Specifically, Mustafa stated that he needed
to account for “how much money he [Matrut] has took from me.”  Mustafa testified that after he reviewed his
accounts, he asked Matrut to give him back the check for $5,600 and all other
checks he had in his possession.  Mustafa
testified that in exchange he planned to give Matrut $650 because that is what
he determined Matrut was owed.  Mustafa
testified that Matrut did not bring the checks. 
Mustafa testified that, by the time of trial, he had determined that he
did not owe Matrut anything.  Despite
Mustafa’s allegations that Matrut embezzled money from the company and claim
that his records showed he actually owed Matrut nothing, Mustafa offered no
witnesses or evidence at trial to substantiate these allegations.  

Mustafa also testified that the
checks were never paid by the bank because it was not rightfully Matrut’s
money.  Mustafa testified that usually
when his account had no funds it is because he “t[ook] the money out for [a]
reason because I know he [is] not supposed to receive this much money, and I
don’t transfer.”  

Discussion

A.      Broad
Form Submission

In his third issue, Mustafa argues
that the trial court erred by submitting the fraud liability question in broad
form because it allowed the jury to consider unpled theories of liability.

1.       Allegations
in Matrut’s Petition

Matrut’s original petition simply
alleged, “Defendant committed fraud against Plaintiff, which caused Plaintiff
damages.”  Mustafa made a special
exception and Matrut voluntarily filed Plaintiff’s First Amended Petition,
alleging fraud with greater specificity. 
Plaintiff’s First Amended Petition alleged, in part:

Defendant, who employed Plaintiff, asked Plaintiff if
he could borrow some money.  Plaintiff
believed he needed to loan Defendant the money; otherwise, Plaintiff would
loose [sic] his job.  Thereafter, based
on Defendant’s promise that he would pay Plaintiff back, Plaintiff loaned
$10,600 to Defendant.  On information and
belief, Defendant did not intend to pay Plaintiff back at the time he made the
representation that he would.  Despite
notice and demand, Defendant has refused to pay Plaintiff the $10,600 he owes
Plaintiff.  As a result of Defendant
conduct, Plaintiff has been damaged.

 

Mustafa did not make a special
exception to the amended pleading.

Mustafa argues that the trial court
committed harmful error by submitting a broad-form question on liability for
fraud in Question 1, which allowed the jury to consider both the pled theory
(failure to repay a loan) and unpled theories (failure to pay wages and writing
bad checks).[1]

2.       Evidence
Presented at Trial

Mustafa argues that the following
testimony by Matrut is evidence of an unpled theory of fraud based on Mustafa’s
failure to pay wages:

[MUSTAFA’S COUNSEL]:    So
you are saying this 10,600 represents wages that he owed you? Is that what you
are trying to say, that you had done work for him and he didn’t pay you your
full salary?

 

[MATRUT]:         Yes.

 

Mustafa also argues that Matrut’s
testimony regarding the checks and the admission of the checks into evidence at
trial is evidence of an unpled theory of fraud based on the writing of bad
checks.  Thus, Mustafa argues that the
trial court should have submitted separate questions of fraud regarding these
alleged unpled theories and not submitted the question in broad form. We
disagree.  

3.       Applicable
Law

The Texas Supreme Court has held that
a trial court commits harmful error requiring a new trial when, after proper
objection from the appellant, it “submits a single broad-form liability
question incorporating multiple theories of liability” and, as a result, “the
appellate court cannot determine whether the jury based its verdict on an
improperly submitted invalid theory.”  Crown Life Ins. Co. v. Casteel, 22
S.W.3d 378, 388–89 (Tex. 2000); see Tex. R. App. P. 44.1(a)(2).  In Casteel,
the trial court submitted a single broad-form question combining thirteen
theories of liability, four of which were invalid because the plaintiff did not
have the “consumer” status required for standing under the Deceptive Trade
Practices Act (DTPA).  See generally 22 S.W.3d 378.  Because the broad-form question combined
valid and invalid theories, the appellate court was unable to determine whether
the jury based its finding of liability on a valid or invalid theory.  Id. at
389.  While the complained of theories in
Casteel were invalid because of a
lack of standing, the same rule applies to theories that are invalid due to
defects in pleading.  Id. (citing Lancaster v. Fitch, 112 Tex. 293, 297–98, 246 S.W. 1015, 1016
(1923) (where trial court submitted single general negligence issue with
instructions regarding three distinct theories of negligence liability, one of
which was not properly pled)).  

A trial court is required to submit a
charge on only the issues raised by the written pleadings and evidence.  Tex.
R. Civ. P. 278.  “If there is a
variance between the pleadings and the proof . . . upon proper request, the
trial court should limit a broad issue to those acts or omissions which are
included within the pleadings and supported by some evidence.”  Scott
v. Atchison, Topeka & Santa Fe Ry. Co., 572 S.W.2d 273, 282 (Tex.
1978).   Assuming the appellant properly
objects to the unpled theory, a trial court’s broad-form question commingling
valid theories with unpled theories would be error.  See
Casteel, 22 S.W.3d at 389.

4.       Analysis

Matrut’s evidence did not present any
unpled theories of fraud for the jury to consider in Question 1.  The pleadings and the evidence presented at
trial clearly establish that Matrut’s fraud theory of recovery is the failure
to repay a loan.  

A review of the entire record on
appeal reflects that Matrut’s evidence of Mustafa’s failure to pay his salary
and writing bad checks was evidence to support his claim that Mustafa failed to
perform his promise to pay on a loan and Matrut’s reliance on this promise to
his detriment. This evidence did not present a separate unpled theory of fraud.
 At trial, Matrut testified that, during
his employment, Mustafa asked Matrut to loan him money by allowing him to pay
the salary that Matrut had earned at a later date, and that he loaned Mustafa
over $10,600.  Matrut testified that
Mustafa promised to repay the loan at a later date.  Matrut testified that Mustafa never repaid him
as promised. Matrut testified that, instead, Mustafa continued to give him
checks on accounts with insufficient funds. 


On appeal, Mustafa states that the
testimony was “nearly indecipherable,” “perhaps due to language barriers.”  Mustafa argues that from Matrut’s trial
testimony “it is completely unclear . . . whether Mustafa’s alleged
indebtedness to Matrut stemmed from a loan that Mustafa did not repay to Matrut
. . . or failure by Mustafa to pay wages owed to Matrut.”  Contrary to Mustafa’s arguments, Matrut’s
testimony that the $10,600 claimed as fraud damages came from his unpaid salary
from Mustafa does not constitute evidence of an unplead failure to pay wages
theory of fraud.  It is undisputed that
Matrut also testified that he agreed to allow Mustafa to keep the salary that
Matrut had earned as a loan, in exchange for Mustafa’s promise to repay the
amount.  The source of the loaned funds
does not change the character of the claim. 
This dispute arises from Mustafa’s failure to keep his promise to pay on
a loan and Matrut’s reliance on this promise to his detriment. 

Likewise, we also conclude that
Matrut’s evidence of Mustafa’s writing checks with insufficient funds is not
evidence of an unpled theory of fraud, but rather evidence indicating Mustafa’s
intent to defraud Matrut because he had no intention of repaying the loan.  The promise underlying his fraud claim was
Mustafa’s promise to repay the loan and the unpaid checks were evidence of
Mustafa’s intent not to perform as promised.

Finally, contrary to Mustafa’s
arguments on appeal, the pretrial discovery in this case reflects that he was
not “ambushed” by the presentation of the unpaid checks at trial as evidence of
his intent not to pay the loans.  Instead,
bank records were a central issue to the case. 
In fact, Mustafa produced bank records for several of his accounts
during discovery.  Accordingly, we
overrule Mustafa’s third issue.

B.      Unpled
Basis for Damages

In his fourth issue, Mustafa argues that,
since the “trial court erred in submitting jury question number one in broad
form over [Mustafa’s] objection,” it also erred by not submitting a separate
damage question for Matrut’s failure to pay wages theory of fraud.  As we held above, the trial court did not err
in submitting a broad form question in this case because Matrut did not advance
an unplead theory of fraud based on Mustafa’s failure to pay Matrut’s wages.  Instead, he pled and recovered upon a claim
that Mustafa committed fraud by inducing Matrut to loan him money when he had
no intention of repaying the money. 
Accordingly, we hold that the trial court was not required to submit a
separate damage question on a theory of fraud based on the failure to pay
wages.  Accordingly, we overrule Mustafa’s
fourth issue.

C.      Sufficiency of the Evidence

In his first and second issues on
appeal, Mustafa challenges the legal and factual sufficiency of the evidence to
support the finding of fraud. 
Specifically, he contends that the evidence is legally and factually
insufficient to show that, at the time he promised to repay Matrut, he did not
intend to fulfill his promise. 

1.       Elements
of Fraud

The elements of fraud are: (1) a
material misrepresentation was made; (2) the representation was false; (3) when
the representation was made, the speaker knew it was false or made the
statement recklessly without any knowledge of the truth; (4) the speaker made
the representation with the intent that the other party should act on it; (5)
the party acted in reliance on the representation; and (6) the party thereby
suffered injury.  Formosa Plastics Corp. USA v. Presidio Eng’rs
& Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998).  In his first and second issue, Mustafa argues
the evidence is legally and factually insufficient to prove that the third
element of fraud listed above.

“A promise of future performance
constitutes an actionable misrepresentation if the promise was made with no
intention of performing at the time it was made.”  Id.
at 48 (citing Schindler v. Austwell
Farmers Coop., 841 S.W.2d 853, 854 (Tex. 1992)).  Intent to defraud is “not usually susceptible
to direct proof.”   Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 305 (Tex.
2006).  Evidence of a party’s failure to
perform a promise and the denial of making the promise are factors that may be
considered as establishing fraudulent intent but, without more, such evidence
is not legally sufficient to establish that the promise was made with no
intention of performing at the time it was made.  Id.  

However, while breach of a promise
alone is not evidence of fraudulent intent, such a breach combined with even “slight
circumstantial evidence” of fraud is enough to establish fraudulent
intent.  Id. at 305 n.18 (concluding
that  evidence, including defendant’s
spoliation of evidence, altering terms and forging signatures on contract in
question, and misrepresentation in refusing to provide plaintiff with a refund,
showed more than mere breach of contract and supported finding of fraudulent
intent).  Acts subsequent to the making
of a promise may be considered as factors in determining whether intent not to
perform existed at the time the promise was made.   See id.
at 305–06; see also Weinberger v.
Longer, 222 S.W.3d 557, 562 (Tex. App.—Houston [14th Dist.] 2007, pet.
denied) (“While a party’s intent is determined at the time he made the
representation, intent may be inferred from his subsequent acts after the
representation was made”).  

Applying this guidance to the present
case, we must determine whether sufficient evidence existed to prove more than
mere breach of contract and support a finding of fraudulent intent.

2.       Standards
of Review

When a party who does not have the
burden of proof at trial challenges the legal sufficiency of the evidence, we
consider all of the evidence in the light most favorable to the prevailing
party, indulging every reasonable inference in that party’s favor and
disregarding contrary evidence unless a reasonable fact-finder could not.  City of
Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005); City of Houston v. Hildebrandt, 265 S.W.3d 22, 27 (Tex.
App.—Houston [1st Dist.] 2008, pet. denied) (citing Assoc. Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285–86
(Tex. 1998)).  “If there is any evidence
of probative force to support the finding, i.e., more than a mere scintilla, we
will overrule the issue.”  Hilderbrandt, 265 S.W.3d at 27 (citing Haggar Clothing Co. v. Hernandez, 164 S.W.3d 386, 388 (Tex. 2005)).

In reviewing a factual sufficiency
complaint, we must first examine all of the evidence.  Lofton
v. Texas Brine Corp., 720 S.W.2d 804, 805 (Tex. 1986).  Having considered and weighed all the
evidence, we should set aside the verdict only if the evidence is so weak, or
the finding is so against the great weight and preponderance of the evidence,
that it is clearly wrong and unjust.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986).  We cannot merely substitute our
opinion for that of the trier of fact and determine that we would reach a
different conclusion.  Hollander v. Capon, 853 S.W.2d 723, 726
(Tex. App.—Houston [1st Dist.] 1993, writ denied).

“The jury is the exclusive judge of
the facts proved, the credibility of the witnesses and the weight to be given
to their testimony.”   Dyson v. Olin Corp., 692 S.W.2d 456, 458
(Tex. 1985) (quoting Benoit v. Wilson,
150 Tex. 273, 281, 239 S.W.2d 792, 796 (1951)). 
When the trier of fact is presented with conflicting evidence, it may
believe one witness and disbelieve others. 
McGalliard v. Kuhlmann, 722
S.W.2d 694, 697 (Tex. 1986) (citing Ford
v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 542, 252 S.W.2d 561, 563
(1952)).  The trier of fact is permitted
to resolve inconsistencies in the testimony of any witness.  Id. (citing
Benoit, 150 Tex. at 281–82, 239
S.W.2d at 797–98 (1951)).  The jury, as
the trier of fact, may also draw inferences from the facts and choose between
conflicting inferences.   Ramo, Inc. v. English, 500 S.W.2d 461,
467 (Tex. 1973).  We cannot overturn the
fact finder’s ruling unless only one inference can be drawn from the
evidence.  Havner v. E-Z Mart Stores, Inc., 825 S.W.2d 456, 461 (Tex.
1992).   

3.       Analysis

 Mustafa argues that there is no evidence that
he did not intend to perform any promise to pay Matrut at the time the promise
was made. The crux of this argument is Mustafa’s continued assertion that
Matrut’s theory of fraud is not the failure on a promise to repay a loan; as
clearly set forth in Matrut’s pleadings but, rather, the “failure by Mustafa to
pay wages owed to Matrut.”  He argues
that “given there is no evidence as to when the wages were supposedly withheld
from Matrut, there likewise is no evidence as to any promises made by Mustafa
at the time the wages were withheld” and, therefore, “nothing from which any inference
can be made that he did not intend to pay Matrut when he promised him whatever
salary was agreed upon.”  Mustafa’s
arguments misconstrue Matrut’s pleadings and are contrary to the evidence
presented at trial. 

As we have held, Matrut’s theory of fraud
is Mustafa’s failure to keep his promise to pay on a loan and not, as argued by
Mustafa, the “failure by Mustafa to pay wages owed to Matrut.”   In other words, Matrut is not asserting that
Mustafa “did not intend to pay Matrut when he promised him whatever salary was
agreed upon” but, rather, he is arguing that Mustafa did not intend to pay
Matrut when he asked to keep money to which Matrut was entitled and promised to
pay him back.  

Here, we hold that there is
sufficient evidence, in addition to Mustafa’s failure to repay the loan,
establishing that Mustafa did not intend to repay the loan at the time he made
the promise to repay.  First, there is
evidence that, despite promising to repay Matrut, Mustafa prevented Matrut from
ever receiving this money.  There is
evidence that Mustafa not only wrote the checks to Matrut knowing that there
were insufficient funds in the account to pay the checks, but he also (1) took
money out of the account for the express purpose of preventing Matrut from
being able to cash the checks, and (2) avoided using his available line of
credit to honor Matrut’s checks as he had done with other checks. 

Mustafa’s bank records, which were
admitted at trial, established that he did not have sufficient funds at the
times the three checks were written. 
There is evidence that the existence of insufficient funds was not a
mistake or oversight by Mustafa but the result of his efforts to keep Matrut
from being repaid.

 At trial, Mustafa initially testified that he
did not owe Matrut $10,600 because Matrut had already received the checks for
that amount.  Mustafa testified, “He
received account for 10,600.  Do you see
that?  He come with the check.”  However, when Matrut’s counsel pointed out
that the three checks were never paid, Mustafa changed his testimony,
explaining the bank did not pay for a reason.  When asked for the reason, Mustafa explained
that the bank did not pay the checks because it was not rightfully Matrut’s
money. Mustafa testified that, when his account had insufficient funds, it was
usually because he transferred funds out of the account so that Matrut could
not receive payment on the checks.  Mustafa testified that he knew Matrut was “not
supposed to receive this much money” so he “d[id]n’t transfer” sufficient funds
into the account. 

In addition, there is evidence that,
to prevent Matrut from being repaid, Mustafa did not order a “forced pay check”
to transfer money from his lines of credit into his checking account to pay on
the checks to Matrut as he was able to do and he had done with respect to other
checks written when there were insufficient funds in the account. There was
also testimony that Mustafa had up to six other accounts with funds he could
have transferred to the account he used to write the check to Matrut. 

Next, there is evidence that despite
making the promise to repay, Mustafa attempted to destroy all evidence of the
loan.  Matrut testified that he gave the
first two returned checks in the amount of $5,600 to Mustafa after making
photocopies of them without Matrut’s knowledge. 
Matrut testified that, after Mustafa continually assured him that the
all of the loan would be repaid, Mustafa called Matrut and “t[old] him [to]
bring the check [for] the $5,600” and all the other checks he had in his
possession.  In exchange for bringing the
checks to the shop, Mustafa told Matrut, “I will give you your money.”  However Mustafa testified that he had
determined that he owed Matrut only $650 and after receiving the checks he
planned to only pay Matrut $650 and not $10,600 that Matrut testified that he
was owed.  Matrut did not return the
check to him.  At trial, the only
original check presented into evidence was the check for $5,600 that Matrut
refused to return to Mustafa.  Mustafa
did not have the originals of the first two checks and only the photocopies
offered by Matrut where available. 
Mustafa did not offer any testimony at trial as to the whereabouts of
the original two checks he received back from Matrut.  See Chapa, 212 S.W.3d at 306
(noting testimony that car dealer “snatched” contract after obtaining signature
and must have later destroyed it, and holding that spoliation of evidence
provides some circumstantial evidence of fraud).

Finally, we find Mustafa’s
inconsistent trial testimony as to the very existence of the loan to be some
circumstantial evidence of this fraudulent intent.  At trial, Mustafa offered multiple, often
conflicting, accounts of whether he owed money to Matrut and why.  Through most of the trial Mustafa denied owed
Matrut any money at all.  However,
Mustafa also testified that at some point he determined that he did in fact owe
Matrut money.  He testified that, after
reviewing his accounts, he determined that he only owed Matrut $650, not
$10,600.  When cross examined on this
testimony, in light of his testimony that he did not owe Matrut any money at
all, Mustafa then testified that he believed that Matrut had stolen money from
the company and he had to offset this from any monies that he owed Matrut.  Based on this “offset,” Mustafa testified
that he had determined that he did not owe any money after all to Matrut by the
time of trial.  However, Mustafa offered
no documentation whatsoever to support this accusation of theft.

At another point during the trial,
Mustafa contended that no money was owed because Matrut already received checks
in the amount claimed owed.  When it was
pointed out to him that these checks went unpaid, he then testified that he took
money from these accounts because Matrut was not owed the amounts of money
indicated on the checks.  He also
testified, with regard to two of the three checks, that although it was his
signatures on the checks, the checks were given to Matrut to buy auto parts for
Mustafa’s business, not to repay monies he owed to Matrut. 

We conclude that this evidence,
coupled with evidence of Mustafa’s promise to repay the loan, continued
assurances to Matrut that he would in fact pay the loan, and failure to honor
this promise supports an inference that Mustafa had the requisite fraudulent
intent at the time he promised to repay Matrut. 
See Chapa, 212 S.W.3d at 305–06;
see also Weinberger, 222 S.W.3d at
562.  Accordingly, we hold that the
evidence is legally sufficient to support the jury’s finding of fraud as
presented in Question 1.  

In support of his factual sufficiency
argument, Mustafa argues that the testimony in this case was “nearly
indecipherable” and “non-responsive answers seemed to be the rule on both sides.”  While there were apparent language
difficulties during the trial and there were apparent inconsistent answers
given by both parties, the jury is permitted to assess the credibility of the
witnesses and resolve the conflicting testimony.  Thus, inconsistencies in the testimony do not
make the evidence supporting the jury’s finding of fraud factually
insufficient.  See McGalliard, 722 S.W.2d at 697 (jury is permitted to resolve
inconsistencies in witness’s testimony); see
also Dillard Dep’t Stores, Inc. v. Silva, 148 S.W.3d 370, 372 (Tex. 2004)
(“when testimony is contradictory, credibility is for the fact finder to
decide”).  

After considering and weighing all
the evidence, we cannot conclude that the evidence is so weak, or the finding
is so against the great weight and preponderance of the evidence, that it is
clearly wrong and unjust.  See Cain, 709 S.W.2d at 176.  We hold that the evidence in support of the
fraud finding is factually sufficient.  We
overrule Mustafa’s first and second issues.

D.      Sufficiency of Evidence
under the Clear and Convincing Standard

In his fifth issue, Mustafa argues
that there was not clear and convincing evidence to support the jury’s finding
in Question 3 that Mustafa committed fraud. 
“Clear and convincing evidence” is defined as “the measure or degree of
proof that will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established.”   Foley v. Parlier, 68 S.W.3d 870, 880
(Tex. App.—Fort Worth 2002, no pet.). 
The clear and convincing standard is an intermediate burden of proof,
less than “beyond reasonable doubt” but greater than the usual standard in
civil cases of “preponderance of the evidence.” 
Id. 

The entirety of Mustafa’s argument in
this regard is as follows:  

First without repeating the arguments made under
Issues One and Two, supra, Appellant
would point out that even if this Court were to determine that the evidence was
legally and factually sufficient to prove the elements of fraud under a preponderance
standard, the higher burden of proof clear and convincing evidence, has clearly
not been met in this case, for the reasons stated under such arguments.  

 

Under issues one and two, Mustafa
argues that there is no evidence that, at the time he made a promise to Matrut,
he did not intend to perform the promise. He also argues that the evidence
presented at trial was so “indecipherable,” due in part to language barriers,
that there was no evidence from which the jury could find that Mustafa did not
intend to perform the promise at the time it was made. As we held above,
contrary to Mustafa’s arguments, there is legally and factually sufficient
evidence to support each of the requisite elements of a fraud claim in this
case and, despite the language difficulties of the parties, a jury could
understand this evidence.  Reviewing the
record as a whole, we also hold that this evidence is clear and convincing as
to each element of Matrut’s fraud claim. 
See Foley, 68 S.W.3d at 880.  Accordingly, we overrule Mustafa’s fifth
issue.

E.      Amount of Exemplary Damages
Awarded

In his sixth issue, Mustafa argues
that the jury’s award of exemplary damages in the amount of $75,000 “is not
supported by factually sufficient evidence” and it violates his substantive due
process right to protection from “grossly excessive” punitive damages. 

1.       Kraus
Factors

We review an award of exemplary
damages with careful scrutiny to ensure it is supported by the evidence, and we
may vacate the award or suggest a remittitur “only if the award is ‘so
factually insufficient or so against the great weight and preponderance of the
evidence as to be manifestly unjust.’” Transp.
Ins. Co. v. Moriel, 879 S.W.2d 10, 30 (Tex. 1994) (citing Pope v. Moore, 711 S.W.2d 622, 624 (Tex.
1986)).  Exemplary damages must be
reasonably proportioned to actual damages. 
Alamo Nat’l Bank v. Kraus, 616
S.W.2d 908, 910 (Tex. 1981).  There is no
set rule or ratio between the amount of actual and exemplary damages which will
be considered reasonable; this determination must depend upon the facts of each
particular case.  Id. 

The factors set forth in Kraus provide the framework for our
review of whether an award of exemplary damages is excessive.  Id; see
Moriel, 879 S.W.2d at 31 (when
conducting factual sufficiency review of punitive damage award, court of
appeals must detail relevant evidence and explain why evidence does or does not
support award in light of Kraus
factors).  The factors to be considered
include:  “(1) the nature of the wrong,
(2) the character of the conduct involved, (3) the degree of the culpability of
the wrongdoer, (4) the situation and sensibilities of the parties concerned,
and (5) the extent to which such conduct offends a public sense of justice and
propriety.”  Kraus, 616 S.W.2d at 910. 
The Civil Practice and Remedies Code also adds that evidence, if any,
relating to the defendant’s net worth can be considered as a factor.  Tex.
Civ. Prac. & Rem. Code Ann. § 41.011 (Vernon 2008).  The jury charge on the exemplary damages
question instructed the jury to consider these factors.

First, Mustafa argues that there was
factually insufficient evidence to support the exemplary damages award under Kraus because the testimony was
unclear.  Specifically, he argues:

The first three [Kraus]
factors, “the nature of the wrong,” “the character of the conduct involved” and
“the degree of culpability of Osman Mustafa,” are muddled in this case. It is
unclear form the testimony exactly what specific “wrong,” “conduct,” or
“culpability” was involved. Did Mustafa fail to pay back a loan or did he fail
to pay wages?  

 

We disagree.  As we held above, the record establishes that
this dispute arises from Mustafa’s failure to keep his promise to pay back a
loan and Matrut’s continued reliance on this promise to his detriment.  Further, we have held that there is factually
and legally sufficient evidence to establish each element of a fraud claim
against Mustafa for this wrongful conduct. 

Next, regarding the fourth and fifth Kraus factors, Mustafa argues that the
award is excessive because: 

As for the fourth Kraus factor, “the situation
and sensibilities of the parties concerned,” there is no suggestion of Matrut's
being in an uneven or vulnerable position vis-a-vis Mustafa. Did Mustafa's
conduct (whatever his precise conduct was found to be) “offend a public sense
of justice and propriety” Even if this Court determines that Mustafa did not
repay a loan, or withheld wages, such does not offend a public sense of justice
to the tune of $75,000.00.

 

We also disagree.  Contrary to Mustafa’s assertion, there is
factually sufficient evidence in the record establishing that Matrut was in a
vulnerable position and Mustafa, as his boss and purported friend, unfairly took
advantage of him.  Because we give due
deference to the jury’s resolutions of conflicts in testimony, we conclude
that, although Matrut and Mustafa gave different accounts of their
relationship, the testimony regarding this issue is not unclear.  See In
re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). 

The evidence establishes  a situation of disparate bargaining power, in
which Mustafa used his superiority and special relationship as the employer,
their shared cultural heritage and Matrut’s relatively recent arrival to this
country to coerce Matrut into agreeing to a loan that Mustafa did not intend to
repay.  In this case, Matrut testified
that he loaned his employer and friend, Mustafa, $10,600 in exchange for his
promise to repay the money.  Matrut
testified that he loaned the money by agreeing to forgo his earned wages from
Mustafa.  This was a large sum to Matrut
because Matrut made around $24,000 a year in salary.  Mustafa was Matrut’s boss and Matrut
testified that he believed that might lose his job if he did not agree to the
loan.  Mustafa’s special relationship as
Matrut’s employer gave him the upper hand, unique from the usual position of a
debtor. 

 
Matrut testified that Mustafa repeatedly assured Matrut to trust him to
repay the loan and referred to him as “brother.”  Because of Matrut’s trust for Mustafa, Matrut
testified that he never got Mustafa’s promise in writing.  Matrut testified that he did not expect
Mustafa to pay him back with interest and also said he did not try to pursue
criminal action against Mustafa because he was his friend. Matrut explained
that in their culture, people could be trusted on their word.  Matrut testified that when Mustafa failed to
pay him as promised, he demaned repayment, telling Mustafa that he needed the
money to take care of himself and pay for his apartment.  However, instead of repaying the loan, there
is evidence establishing that Mustafa continued to (1) issue bad checks to
Matrut, (2) prevent  payment on these
checks by money transfers out of the account, and (3) insist that Matrut trust
Mustafa.  Matrut testified that because
of Mustafa’s fraudulent conduct and coercion, Matrut quit his only job.

At trial, Mustafa did not show
remorse regarding his conduct, as he insisted he owed Matrut nothing and
offered different and sometimes inconsistent explanations to explain as to why
he would have written three checks to Matrut. 
Despite the three unpaid checks totaling $10,600 that were written to
Matrut and Mustafa’s testimony that at one time he had determined that he owed
Matrut $650, Mustafa testified that after reviewing his account records he
determined that he owed Matrut nothing. 
Mustafa testified that he based this determination in part on his belief
that Matrut had embezzled money from his company.  However at trial Mustafa offered no evidence
of this alleged theft.  Accordingly, we
conclude that this evidence is factually sufficient to establish the fourth and
fifth Kraus factors.

Finally, Mustafa argues that the
evidence was factually insufficient to support the award because Matrut offered
no evidence of Mustafa’s net worth.  We
disagree.  The lack of evidence of
defendant’s net worth does not affect the factual sufficiency of the jury’s
assessment of punitive damages.  As Texas
courts have held, nothing in Chapter 41 of the Texas Civil Practice and
Remedies Code or Texas case law indicates that evidence of defendant’s net
worth is necessary for the jury to award exemplary damages.  Durban
v. Guajardo, 79 S.W.3d 198, 210–11 (Tex. App.—Dallas 2002, no pet.); see Tex.
Civ. Prac. & Rem. Code Ann. § 41.011 (“trier of fact shall consider
evidence, if any, relating to: . . .
(6) the net worth of the defendant.”) (emphasis added).  “Instead, it is merely a relevant issue, as
relevant to the defendant to prove his low net worth as to the plaintiff to prove
the defendant's high net worth.”  Durban, 79 S.W.3d at 211. Accordingly we
conclude that there is factually sufficient evidence under state law to support
an award of exemplary damages in this case. 

2.       Substantive
Due Process

Even if an assessment of exemplary
damages is not deemed excessive under governing state law, it may violate a
party’s substantive due process right to protection from “grossly excessive”
exemplary-damage awards.  Owens-Corning Fiberglas Corp. v. Malone,
972 S.W.2d 35, 45 (Tex. 1998) (citing BMW
of N. Am., Inc. v. Gore, 517 U.S. 559, 568, 116 S. Ct. 1589, 1595 (1996)); see also U.S. Const. amend. XIV, § 1 (“[N]or shall any State deprive any
person of life, liberty, or property, without due process of law”).  “Punitive damages may properly be imposed to
further a State's legitimate interests in punishing unlawful conduct and
deterring its repetition.”  Gore, 517 U.S. at 568, 116 S. Ct. at
1595.  “Only when an award can fairly be
categorized as ‘grossly excessive’ in relation to these interests does it enter
the zone of arbitrariness that violates the Due Process Clause of the
Fourteenth Amendment.”  Id.  

  
The United States Supreme Court in Gore
established three guideposts for determining whether the amount of an
exemplary-damage award is unconstitutionally excessive:  (1) the degree of reprehensibility of the
defendant's misconduct; (2) the disparity between actual and punitive damages;
and (3) a comparison of the punitive damages awarded and other civil or
criminal penalties that could be imposed for similar misconduct.  Chapa,
212 S.W.3d at 308 (citing Gore, 517
U.S. at 574–75, 116 S. Ct. at 1598). 
Whether a punitive damage award passes constitutional muster under this
standard is a question of law that we review de novo.  Id.
at 307.

Mustafa argues that under the second
guidepost in Gore – the disparity
between actual and punitive damages –“punitive damage awards of more than seven
times the compensatory damages exceeds the line of constitutional impropriety”
and, accordingly, we must reverse Matrut’s award of $75,000.  The United States Supreme Court’s holding in Campbell provides guidance in our
analysis of this argument:

We decline again to impose a bright-line ratio which a
punitive damages award cannot exceed. Our jurisprudence and the principles it
has now established demonstrate, however, that, in practice, few awards
exceeding a single-digit ratio between punitive and compensatory damages, to a
significant degree, will satisfy due process. In Haslip, in upholding a punitive damages award, we concluded that an
award of more than four times the amount of compensatory damages might be close
to the line of constitutional impropriety. 499 U.S., at 23-24, 111 S. Ct. 1032.
We cited that 4-to-1 ratio again in Gore.
517 U.S., at 581, 116 S. Ct. 1589.

 

538 U.S. at 425, 123 S. Ct. at 1524.

 

Comparing the record regarding the
defendants’ conduct in Campbell and Gore to the record of Mustafa’s conduct
and applying the three guideposts in Gore,
we conclude that the jury’s award of $75,000 in exemplary damages, while
supported by some evidence, was grossly excessive.  See
Signal Peak Enters. of Tex., Inc. v. Bettina Invs., Inc., 138 S.W.3d 915,
928 (Tex. App.—Dallas 2004, pet. struck). 
Considering that Matrut suffered only economic harm, an award of $75,000
is substantially greater than that amount which could reasonably be assessed to
punish the defendant for his conduct.  See Fairfield v. Stephens, 246 S.W.3d
653, 666 (Tex. 2008) (recognizing that exemplary damage awards serve to punish
the wrongdoer and set a public example). 
Although a precise figure of net worth was not presented at trial,
Mustafa’s bank statements indicate probable financial hardship from a damage
award of $75,000.  See, e.g., id.  

However, under the factors set forth
in Kraus we also conclude that a
rational jury could have found that the nature of the wrong, the character of
the conduct, the degree of culpability, the situation and sensibilities of the
parties, and the public’s sense of justice and propriety required Mustafa to
pay some amount of exemplary damages in this case.  See
Khorshid, Inc. v. Christian, 257 S.W.3d 748, 769 (Tex. App.—Dallas 2008, no
pet.). 
Thus, we hold that the evidence is factually sufficient to support a
lesser award of exemplary damages.  See Tex.
R. App. P. 46.3.  

Pursuant to Rule 46.3 and the due
process clause of the U.S. Constitution, we suggest a remittitur to $31,800 in
exemplary damages, three times the amount of compensatory damages found by the
jury.  See Tex. R. App. P.
46.3; Chapa, 212 S.W.3d at 308 (“four
times the amount of compensatory damages might be close to the line of
constitutional impropriety”). 
Accordingly, if Matrut files in this Court, within twenty-one days from
the date of this opinion, a remittitur to $31,800 with respect to exemplary
damages, the trial court’s judgment will be thus reformed and will be affirmed
as modified.  See Tex. R. App. P.
46.3.  If the suggested remittitur is not
timely filed, this cause will be reversed and remanded to the trial court for a
new trial on all issues.  See id.; Tex. R. App. P. 44.1(b) (appellate court may not order a
separate trial solely on unliquidated damages if liability is contested).  Accordingly we sustain Mustafa’s sixth issue.

Conclusion

          We suggest remittitur as to the award of exemplary
damages, and otherwise affirm the trial court’s judgment as modified.  In the event a remittitur is not timely
filed, we will reverse the judgment and remand the case for a new trial.

 

 

                                                          George
C. Hanks, Jr.                                                                                           Justice 

 

Panel consists of Justices Jennings,
Hanks, and Bland.

Justice Jennings, concurring in
judgment only.











[1] Mustafa’s trial counsel initially objected to evidence
coming in on unpled claims of failure to repay wages.  However, during the charge conference,
Mustafa’s trial counsel and the court’s comments appear to be directed at the
inclusion of the unpled theory of fraud for writing of bad checks.  During the charge conference, Mustafa’s
attorney made his objection by asking the court to consider everything he said
earlier and requesting that his proposed question be used that asked: “Did the
Defendant Mustafa commit fraud against the Plaintiff Matrut by refusing to pay
to Matrut the loan of 10,600?”  It is
unclear which of the two unpled theories Mustafa is asserting on appeal because
he quotes sections of the record discussing both the failure to pay wages and
writing bad checks. Accordingly, we will address both of these issues.