

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| EL PASO HEALTHCARE SYSTEM, LTD., d/b/a LAS PALMAS MEDICAL CENTER, | § § § | No. 08-13-00285-CV |
| Appellant, | § | Appeal from the |
| v. | § | County Court at Law No. 3 |
| LAURA MURPHY, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2004-2844) |
| | § | |

**O P I N I O N**

In this retaliatory-discharge and tortious-interference case, a jury found El Paso Healthcare System, Ltd., d/b/a Las Palmas Medical Center liable for discharging Laura Murphy in violation of Section 161.135 of the Texas Health and Safety Code and tortiously interfering with Murphy's business relationship with her employer, West Texas OB Anesthesia. The jury awarded Murphy $31,000 for lost wages, $300,000 for "[c]ompensatory damages in the past," and $300,000 for "[c]ompensatory damages in the future." The trial court entered judgment on the jury's verdict and awarded Murphy $88,980 in trial attorney's fees and $102,500 in conditional appellate fees. In four issues, El Paso Healthcare contends that the trial court erred in awarding attorney's fees

(Issue Four) and that the jury erred in finding it was liable (Issues One and Two) and in awarding "compensatory" damages (Issue Three).   We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Murphy is a certified registered nurse anesthetist (CRNA).   In 2001, she began working in that capacity as an independent contractor for West Texas OB, a group providing CRNA nurses to two hospitals in El Paso: Las Palmas and Del Sol.   Although Murphy was credentialed at both, she worked almost exclusively at Las Palmas in its labor and delivery unit.   In May 2004, Murphy reported to Las Palmas's Ethics and Compliance Coordinator, Susan McPherson-Muller née McPherson, that one of the hospital's obstetricians, Dr. Frederick Harlass[1], had failed to obtain informed consent from one of his patients, a nineteen-year-old who opposed the idea of giving birth via cesarean section.   According to Murphy, Dr. Harlass had obtained the patient's consent to a cesarean section by rebuking her, "[w]ell, if you want a brain-damaged or a dead baby, don't blame me," rather than by explaining to her the risks and benefits of the procedure.[2]

When reporting the incident to McPherson, Murphy voiced her concern that she was jeopardizing her career by complaining about Dr. Harlass.   McPherson assured Murphy that her complaint would be treated in confidence and investigated by Risk Management.   But McPherson neglected to inform Murphy that, because her complaint concerned patient care, it would be forwarded by Risk Management to the Medical Staff for its consideration.   At that time, Guadalupe Rodriguez née Contreras was the director of both Risk Management and the Medical Staff, and Dr. Harlass was a member of the Medical Staff and the medical director of perinatal and

---

[1] Dr. Harlass was not employed by Las Palmas, but he had privileges to practice there.

[2] The surgery was successful, and the patient never brought a claim against Dr. Harlass based upon lack of informed consent.

high-risk maternity services.[3]   Approximately two to three hours after Murphy spoke to McPherson, one of West Texas OB's partners, Margie Collins, informed Murphy that she would not be working at Las Palmas until further notice in light of her complaint against Dr. Harlass and his complaint against her.[4]   Murphy was also told that she would not be welcomed at Del Sol. Murphy was never contacted by Risk Management.   Instead, approximately one month after the incident, she received a letter from the chairman of the Credentialing and Peer Review Committees asking her to contact the credentialing coordinator for Medical Staff to schedule a meeting.   When Murphy contacted the coordinator and asked her the purpose of the meeting, the coordinator would not divulge that information.[5]   Fearing that her credentials could be "jerked," Murphy requested that her attorney be permitted to attend.   Murphy's request was denied, and she filed suit against El Paso Healthcare in July 2004.

Murphy brought causes of action for retaliatory discharge under Section 161.135, tortious interference with a contract and business opportunities, and breach of contract.[6]   She sought recovery of economic damages and "non-economic damages associated with having to leave her community, emotional suffering, mental anguish, inconvenience, and loss of enjoyment of life."

While her suit was pending, Murphy did not return to either Las Palmas or Del Sol, and West Texas OB assigned her to the labor and delivery unit of a hospital in Las Cruces, New

---

[3]  At trial, Dr. Harlass testified he did not become aware of Murphy's complaint against him until one week before trial commenced.  At trial, both McPherson and Rodriguez testified they did not inform Dr. Harlass of Murphy's complaint against him.

[4]  Dr. Harlass verbally complained to Fred Utter, a partner at West Texas OB, about what he described as Murphy's "interfer[ence] in the obstetric realm of this patient, interfer[ence] in the obstetric management of this patient, interfer[ence] with regard to talking to that patient about obstetric issues before I did to explain what the situations were."

[5]  At trial, Guadalupe Rodriguez testified the purpose of the meeting was "to then conduct a preliminary investigation over whether the matter needed to go further than a collegial meeting."

[6]  Murphy abandoned her breach-of-contract claim at trial.

3

Mexico in November 2004. But when Murphy's hours were reduced at the hospital, she terminated her relationship with West Texas OB in June 2005. That same month, Murphy began working at a hospital in Socorro, New Mexico. When Murphy's contract with the hospital expired in June 2006, she resumed her professional relationship with West Texas OB and regained her lapsed credentials at Las Palmas and Del Sol. Upon her return, Murphy was assigned primarily to Del Sol, though she did work occasionally at Las Palmas. Murphy remained with West Texas OB until December 2011, and her lawsuit against El Paso Healthcare was tried in October 2012.

## STANDARD OF REVIEW

In three of its four issues, El Paso Healthcare challenges the legal sufficiency of the evidence supporting the jury's liability and damages findings. When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding of fact for which the opposing party had the burden of proof, the appellant must demonstrate that there is no evidence, or merely a scintilla of evidence, to support the adverse finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the jury's finding under review. *Id*. at 813. To be more than a scintilla, the evidence must rise to a level that "would enable reasonable and fair-minded people to reach the verdict under review. *Id*. at 827.

In conducting our review, we consider the evidence in the light most favorable to the verdict, indulging every reasonable inference tending to support the finding and disregarding all evidence and inferences to the contrary. *Id*. at 819, 827. We are also mindful in our review that jurors are the sole judges of the credibility of the witnesses and the weight to be given their

4

testimony. *City of Keller*, 168 S.W.3d at 819. This means that they may choose to believe one witness and disbelieve another. *Id.*

## RETALIATORY DISCHARGE

In its first issue, El Paso Healthcare contends that the jury erred in finding it liable for retaliatory discharge. Over El Paso Healthcare's objection, the trial court charged the jury as follows:

> Was Laura Murphy's ethics report to El Paso Healthcare System Limited d/b/a Las Palmas Medical Center made in good faith and a cause of her transfer or adverse employment action of Laura Murphy?
>
> 'Good Faith' means that:
>
> (1) Laura Murphy believes that the conduct reported was a violation of law; and
> (2) Her belief was reasonable in light of the training and experience.
>
> If not rebutted by El Paso Healthcare System Limited d/b/a Las Palmas Medical Center, you can presume that an adverse personnel action was taken because Laura Murphy reported a violation of the law, if Laura Murphy suffers the adverse employment action within sixty (60) days of making the report.

El Paso Healthcare asserts that the jury erred in this question affirmatively because Murphy "did not establish a violation of section 161.135." Specifically, El Paso Healthcare argues that Murphy failed to establish that it violated Section 161.135 in discharging her because "[t]here is no law prohibiting the conduct Murphy reported" and because "[t]here is no evidence she made her report in good faith." We disagree.

### *Applicable Law*

Section 161.135 prohibits hospitals, mental-health facilities, and treatment facilities from retaliating against non-employees who report "a violation of law, including a violation of this chapter, a rule adopted under this chapter, or a rule adopted by the Texas Board of Mental Health

5

and Mental Retardation, the Texas Board of Health, or the Texas Commission on Alcohol and Drug Abuse." TEX.HEALTH & SAFETY CODE ANN. § 161.135(a)(West 2010). To successfully prove this type of retaliatory discharge claim, a plaintiff must show that:

(1)  she was an employee of a hospital, mental health facility, or treatment facility;

(2)  she reported a violation of law;

(3)  the report was made in good faith; and

(4)  she was disciplined, suspended, terminated, transferred, or otherwise discriminated against.

*See Barron v. Cook Children's Health Care Sys.*, 218 S.W.3d 806, 810 (Tex.App.--Fort Worth 2007, no pet.)(construing Section 161.134 of the Texas Health & Safety Code, which prohibits hospitals, mental-health facilities, and treatment facilities from retaliating against employees, in a similar vein); *Tomhave v. Oaks Psychiatric Hosp.*, 82 S.W.3d 381, 385 (Tex.App.--Austin 2002, pet. denied)(same); TEX.HEALTH & SAFETY CODE ANN. § 161.135(a), (c)(1)(B). The non-employee has the burden of proof, except that there is a rebuttable presumption that she was retaliated against if adverse personnel action is taken against her within 60 days after the date on which she made the report in good faith. TEX.HEALTH & SAFETY CODE ANN. § 161.135(c)(1).

### *Discussion*

When viewed in the light most favorable to the verdict, the evidence is sufficient to support a finding that El Paso Healthcare retaliated against Murphy for reporting a violation of law.[7]

There is no dispute that Dr. Harlass was required by law to obtain his patient's informed consent to perform a caesarian section, a procedure requiring full disclosure of its specifics risks and hazards. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 74.103(a)(West 2011); 25 TEX.ADMIN.

---

[7] As Murphy correctly points out in her brief, El Paso Healthcare "does not challenge the jury's finding that it took adverse action against Murphy in retaliation for her ethics report."

CODE § 601.2(k)(2)(2015)(Texas Medical Disclosure Panel, Informed Consent). According to the Texas Medical Disclosure Panel, the specific risks and hazards of delivery by caesarian section that must be disclosed are: (1) injury to bowel and/or bladder; (2) sterility (inability to get pregnant); (3) injury to ureter (tube between kidney and bladder); (4) brain damage, injury or even death occurring to the fetus before or during labor and/or cesarean delivery whether or not the cause is known; and (5) uterine disease or injury requiring hysterectomy (removal of uterus). 25 TEX.ADMIN.CODE § 601.2(k)(2). El Paso Healthcare contends that, because there is no evidence that Dr. Harlass did not disclose any of these risks and because the Texas Medical Disclosure Panel does not require disclosure of the information Murphy alleged Dr. Harlass failed to provide his patient, *i.e.*, explaining why delivery by caesarian section was preferable, Murphy did not report a violation of law. In other words, El Paso Healthcare posits that so long as the risks enumerated above are disclosed, a physician has satisfied his duty to obtain a patient's informed consent to delivery by caesarian section regardless of the process involved in obtaining the consent and of the information conveyed in the process. Putting aside for the moment that Dr. Harlass never testified to disclosing the risks enumerated above—instead, telling his patient that she had to "assume the liability for anything bad that goes wrong" because she refused the recommended course of treatment[8]—El Paso Healthcare's position is untenable.

---

[8] We reproduce verbatim Dr. Harlass's testimony concerning his conversation with his patient:

> [DEFENSE COUNSEL]: With respect to when that occurs, when -- whether it's a CRNA or a labor and delivery nurse, what have you, talking to the patient about obstetrical issues relating to a Cesarean section, does that complicate it when you have to go in and later talk to the patient about the risks of, A, having the procedure and, B, not having the procedure?

> [DR. HARLASS]: Absolutely. One of the foundations of a patient-physician relationship is trust. You need to trust your doctor or you need to find another doctor. It's that simple. When I then have already got it going and talking to this patient whose already talked to somebody else about the opposite of what I need to talk to her, then I have to overcome that fear and overcome that

"With respect to [informed] consent, the requirement that permission be obtained before providing medical treatment is based on the *patient's right to receive information adequate for him or her to exercise an informed decision to accept or refuse the treatment*." [Emphasis added]. *Miller ex rel. Miller v. HCA, Inc.*, 118 S.W.3d 758, 767 (Tex. 2003). "While a claim based on informed consent focuses on whether or not the health care provider advised the patient of the risks and hazards of a particular treatment or procedure, the significance of the *informed consent process* in health care liability claims is not limited solely to claims that involved an alleged failure to advise a patient of such risks and hazards. The *informed consent process*, and the information conveyed therein, can play a significant role in cases that involve surgical claims, claims related to complications from procedures, claims where an election of treatment or alternative modes of treatment for a specific condition are at issue, and claims focusing on the physician's attention to detail in providing care and treatment to patients." [Emphasis added]. Russell G. Thornton, JD, *Informed consent*, 13 BAYLOR UNIVERSITY MEDICAL CENTER PROCEEDINGS 187 (2000). Especially relevant here, although Section 74.103 of the Texas Civil Practice and Remedies Code governs claims based on informed consent, "the statute does not eliminate other basis of liability

---

trepidation. I'm putting myself at legal risk that she may not believe what I'm going to say, and that's exactly what happened to me. I had to go overcome this situation as it occurred and straighten it out.

[DEFENSE COUNSEL]: Are those -- sometimes do you have to be frank with patients and tell them unpleasant news?

[DR. HARLASS]: Absolutely. If a patient refuses to follow a recommended course of event -- and I tell all my patients this -- then you must then assume the liability for anything bad that goes wrong because you didn't take my advice.

[DEFENSE COUNSEL]: Did you have that discussion with this particular patient on the evening of May 12, 2004?

[DR. HARLASS]: Not only this patient, but that is my standard counseling of every patient that I talk to. We need to plot a course that's safe for the mother, plot a course that's safe for the baby. If you choose not to go on that course, then you have to assume that liability.

and/or claims that may arise from a physician's *conduct during the consent process*." [Emphasis added]. 13 BAYLOR UNIVERSITY MEDICAL CENTER PROCEEDINGS, at 188. "[I]ntentional conduct, such as intentional withholding of information during the consent process, may give rise to a cause of action for violation of the Texas Deceptive Trade Practices Act." *Id.* [Footnote omitted].

Murphy's testimony constitutes some evidence that Dr. Harlass's conduct violated the law. The jury could have believed that Dr. Harlass did not obtain his patient's informed consent as required by law because he failed to disclose the specific risks and hazards of delivery by caesarian section enumerated in Section 601.2(k)(2) of the Texas Administrative Code. And the substance of Dr. Harlass's testimony would not have dissuaded the jury from forming such a belief. The jury could have also believed that Dr. Harlass failed to obtain his patient's informed consent as required by law because the process employed by him abridged her right to receive information adequate for her to exercise an informed decision to accept or refuse delivery by caesarian section. Again, the substance of Dr. Harlass's testimony would not have dissuaded the jury from forming such a belief. In addition, the jury could have believed that Dr. Harlass intentionally withheld information from his patient as a penalty for questioning his medical judgment. Yet again, the substance of Dr. Harlass's testimony would not have dissuaded the jury from forming such a belief.

Given our conclusion that the evidence is legally sufficient to support a finding that Murphy reported a violation of law, we need not address El Paso Healthcare's alternate argument that there is no evidence that Murphy made her report in good faith.

El Paso Healthcare's first issue is overruled.

## TORTIOUS INTERFERENCE

In its second issue, El Paso Healthcare argues that the jury erred in finding it liable for tortious interference. With respect to this claim, the trial court submitted the following two questions to the jury:

Question No. 2

Did El Paso Healthcare System Limited d/b/a Las Palmas Medical Center intentionally interfere with the continuation of the business relationship between Laura Murphy and West Texas OB Anesthesia?

Interference is intentional if committed with the desire to interfere with the business relationship or with the belief that interference with that relationship is substantially certain to result.

Answer 'Yes' or 'No':

.            .            .

Question No. 3

Did Las Palmas Medical Center interfere because it had a good faith belief that it had a right to do so?

Answer 'Yes' or 'No':

The jury answered Question No. 2 in the affirmative and Question No. 3 in the negative. El Paso Healthcare asserts that the jurors erred in so answering because Murphy failed to establish that it tortiously interfered with her business relationship with West Texas OB. We disagree.

### *Independently Tortious or Unlawful Conduct*

El Paso Healthcare maintains that Murphy's interference claim fails as a matter of law because she failed to prove that its conduct was either independently tortious or unlawful. In advancing this argument, El Paso Healthcare proceeds on the basis that Murphy's claim is one for tortious interference with a continuing *prospective* business relationship. Citing *Wal-Mart*

10

*Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001), El Paso Healthcare thus contends that, in order to establish its liability for that type of claim, Murphy was required to prove that its act of interference was independently tortious or unlawful. *See Sturges*, 52 S.W.3d at 713 ("[T]o establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful."). According to El Paso Healthcare, "[b]ecause Murphy did not establish a violation of the anti-retaliation statute, she did not establish the independent tortious or unlawful act required to recover for tortious interference in her business relationship with West Texas OB." But the jury question made clear that Murphy's claim was one for tortious interference with an *existing* business relationship, and there is no doubt that, when viewed in the light most favorable to the verdict, the evidence establishes that Murphy had an existing business relationship with West Texas OB, not merely a prospective relationship, even absent a formal contract between them. *Sturges* therefore does not apply.

To recover on a claim for tortious interference with an existing business relationship, a plaintiff is not required to show the defendant's conduct was either independently tortious or unlawful. *See Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)(identifying the elements of tortious interference with an existing contract). Rather, a plaintiff must show: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss. *Id.* at 77. Here, the jury charge did not require Murphy to prove El Paso Healthcare's conduct was either independently tortious or unlawful, and El Paso Healthcare did not object to the absence of such a requirement from the charge. Further, El Paso

11

Healthcare does not challenge the sufficiency of Murphy's proof on the elements of her tortious interference claim. Accordingly, we conclude that El Paso Healthcare has not demonstrated that the evidence supporting Murphy's interference claim is legally insufficient.

## *Justification Defense*

Alternative, El Paso Healthcare argues that it established its justification defense as a matter of law and therefore Murphy cannot recover on her tortious interference claim. To rely on justification, a defendant must establish "the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 80. Justification is established as a matter of law when the defendant's acts, which the plaintiff claims constitute tortious interference, are merely done in the defendant's exercise of its own contractual rights, regardless of motive. *Id.*[9]

El Paso Healthcare claims that it was justified in asking West Texas OB not to reschedule Murphy until her complaint against Dr. Harlass had been fully investigated because it was exercising its legal right under the agreement with West Texas OB to refuse personnel assigned to its facility. Under that agreement, each contractor provided by West Texas OB "[m]ust be accepted by the Facility's Chief Executive Officer; said acceptance may be withdrawn immediately by the Facility's Chief Executive Officer in his or her reasonable discretion at any time with written notice to Contractor." Although El Paso Healthcare's CEO had the contractual right to withdraw his acceptance of Murphy, there is no evidence that he exercised this right, and El Paso Healthcare does not direct us to any portion of the record that would show that he did so.

---

[9] "[I]f the defendant cannot prove justification as a matter of law, it can still establish the defense if the trial court determines that the defendant interfered while exercising a colorable right, and the jury finds that, although mistaken, the defendant exercised that colorable right in good faith." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 80. This alternative basis for establishing justification is not available to El Paso Healthcare because the jury did not find that El Paso Healthcare exercised a colorable right in good faith.

El Paso Healthcare's CEO did not testify at trial, El Paso Healthcare's corporate representative at trial, Guadalupe Rodriguez, never testified that the CEO exercised this right, and there is no "written notice" evidencing the CEO's withdrawal of Murphy's acceptance. More important, even if El Paso Healthcare's CEO had exercised his contractual right to revoke Murphy's assignment at Las Palmas, this does not mean that El Paso Healthcare could do anything under the guise of exercising that right. "A party may not exercise an otherwise legitimate privilege by resort to illegal or tortious means." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 81. El Paso Healthcare cites no authority, and we have found none, for the proposition that justification is available as a defense to unlawful retaliation under any type of anti-retaliation statute.[10] El Paso Healthcare has thus failed to establish it exercised its own legal right or a good-faith claim to a colorable legal right.

El Paso Healthcare's second issue is overruled.

## DAMAGES

In its third issue, El Paso Healthcare maintains that Murphy is not entitled to recover the full amount of damages awarded by the jury. With regard to damages, the trial court charged the jury as follows:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Laura Murphy for her damages, if any, that resulted from such conduct?

> Consider the following elements of damages, if any, and none other.

---

[10] In a suit for tortious interference with a prospective business relationship, justification provides a defense only to the underlying tort. *Sturges*, 52 S.W.3d at 727. "Otherwise, the plaintiff need not prove that the defendant's conduct was not justified . . . nor can a defendant assert such [a] defense[]." *Id.* This makes sense because, as the supreme court recognized, "when two parties are competing for interests to which neither is entitled, then neither can be said to be more justified or privileged in his pursuit." *Id.* That said, *Sturges* neither stands for nor supports the proposition that justification is available as a defense to unlawful retaliation.

13

Do not include interest on any amount of damages you may find.

Do not include back pay or interest in calculating compensatory damages, if any.

Answer separately in dollars and cents for damages, if any.

    a. Lost wages in the past, if any.

    Answer: _____

    b. Compensatory damages in the past, which include emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and damage to reputation, if any.

    Answer: _____

    c. Compensatory damages in the future, which include emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and damage to reputation, if any.

    Answer: _____

As mentioned earlier, the jury awarded Murphy $31,000 for lost wages and $600,000 for past and future compensatory damages. El Paso Healthcare does not challenge the jury's award of lost wages. Instead, it claims that "[t]here is no evidence to support the existence of past and future compensatory damages or the amount of the jury's $600,000 award." We disagree.

### 1. Existence of Past and Future "Compensatory" Damages

The parties dispute whether damages for "emotional pain and suffering," "inconvenience," "loss of enjoyment of life," and "[harm] to reputation" are recoverable as "compensatory" damages under Murphy's retaliation claim or her tortious interference claim. El Paso Healthcare is adamant that these types of "compensatory" damages are not recoverable under either claim, especially the tortious interference one. El Paso Healthcare maintains that, to the extent that these types of damages are recoverable, they are "subsumed within mental anguish and subject to the

14

same specific standards required under Texas law." Murphy takes the contrary position. She not only challenges the notion that non-economic damages are not recoverable in a tortious interference case but also correctly points that Section 161.135 does not expressly limit the types of damages a victim of retaliatory discharge can recover. *See* TEX.HEALTH & SAFETY CODE ANN. § 161.135(d), (e)(allowing plaintiff to recover: (1) "actual damages, including damages for mental anguish even if an injury other than mental anguish is not shown[;]" and (2) "exemplary damages and reasonable attorney fees."). But we need not concern ourselves with this question. This is because the evidence is legally sufficient to support the award of $600,000.00 in past and future "compensatory" damages based on the well-established standard for recovering mental anguish damages.

### *Applicable Law*

To support an award of mental anguish damages, a plaintiff must present either direct evidence of the nature, duration, and severity of her mental anguish, thus establishing a substantial disruption in her daily routine, or evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Latham v. Castillo*, 972 S.W.2d 66, 70 (Tex. 1998); *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Compensable mental anguish includes a mental sensation of pain resulting from emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, or public humiliation, or a combination of any of these. *Wyler Indus. Works, Inc. v. Garcia*, 999 S.W.2d 494, 506 (Tex.App.--El Paso 1999, no pet.). Because mental anguish is nebulous and speculative in nature, jurors are best suited to determine whether, and to what extent, it is compensable by referring to their own experiences. *See Saenz*, 925 S.W.2d at 614; *Star Houston, Inc. v. Shevack*, 886 S.W.2d

15

414, 418-19 (Tex.App.--Houston [1st Dist.] 1994, writ denied).

*Discussion*

When viewed in the light most favorable to the verdict, the evidence is sufficient to support a finding that Murphy experienced a high degree of mental pain and distress constituting more than mere worry, anxiety, vexation, embarrassment, or anger.

The nature, degree, and duration of mental pain and distress suffered by Murphy were substantial. Murphy testified to a loss of self-esteem and a heightened sense of humiliation so profound that she doubted her professional worth and abilities. She also related that the incident made her question the integrity of the medical institutions for which she worked. More devastating to Murphy was the feeling of being powerless, even approximately eight years later, to right wrongs for fear of retribution. She was so shaken by the experience that, at the time of trial, it continued to impact her ability to exercise independent judgment in her professional practice and to enjoy her professional life. In addition, Murphy's mental pain and distress manifested itself physically. She suffered from sleeplessness and stomach problems initially. Although these symptoms abated over time, they resurfaced at trial.

El Paso Healthcare proffered no evidence at trial to rebut Murphy's testimony. On appeal, it contends that Murphy's testimony is insufficient to support an award of mental anguish damages because "[s]he did not testify as to the duration or severity of her past stomach problems . . . [and] did not provide any evidence establishing that her 'tentative' or 'sad' feelings resulted from the purported retaliation." These contentions are belied by the record. It is clear from the record that the adverse employment action experienced by Murphy weighed heavily on her mind and adversely affected her mental well-being. Her testimony was more than sufficient to support an

16

award of mental anguish damages in her favor. *See C & D Robotics, Inc. v. Mann*, 47 S.W.3d 194, 200-01 (Tex.App.--Texarkana 2001, no pet.)(upholding damages for emotional pain, mental anguish, and inconvenience where plaintiff felt "devastated," "depressed," and "humiliated"); *Metal Indus., Inc. of California v. Farley*, 33 S.W.3d 83, 89-90 (Tex.App.--Texarkana 2000, no pet.)(upholding damages for mental anguish where plaintiff experienced loss of self-esteem, anger, devastation, betrayal, disappointment, and sleeplessness); *Wyler Indus. Works*, 999 S.W.2d at 509 (upholding damages for mental anguish where plaintiff testified to humiliation, marital discord, loss of self-esteem, and sleeping difficulties); *Goodman v. Page*, 984 S.W.2d 299, 306 (Tex.App.--Fort Worth 1998, pet. denied)(upholding damages for mental anguish where plaintiff testified to feelings of devastation and humiliation and experienced stomach problems).

El Paso Healthcare also argues that the award of $300,000 in future compensatory damages cannot stand because "there is no evidence whatsoever of any type of future damages resulting from the alleged retaliation in 2004." To support its argument, El Paso Healthcare points to evidence that, despite its alleged retaliation, Murphy resumed working as a CRNA in El Paso in 2006, albeit not in labor and delivery, and continued to do so to this very day. But the test for an award of future compensatory damages consisting of emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and damage to reputation is whether some objective evidence demonstrates there is a reasonable probability that the suffering Murphy was experiencing at trial would more likely than not continue into the future. *See Lubbock County v. Strube,* 953 S.W.2d 847, 857 (Tex.App.--Austin 1997, pet. denied); *Hicks v. Ricardo*, 834 S.W.2d 587, 590 (Tex.App.--Houston [1st Dist.] 1992, no writ). Murphy adduced more than a scintilla of such objective evidence. She testified that, eight years after the fact, she cannot enjoy her

17

professional life and continues to feel humiliated, inadequate, and powerless.

## 2. The Amount Awarded

Lastly, El Paso Healthcare contends that there is no evidence to support the amount of compensatory damages awarded. The evidence must justify the amount awarded. *Saenz*, 925 S.W.2d at 614. Although the impossibility of any exact valuation requires that juries be given a measure of discretion in finding damages, that discretion is limited. *Id*. A jury must find an amount that would fairly and reasonably compensate for the loss; however, juries cannot simply "pick a number and put it in the blank." *Id*. El Paso Healthcare asserts that this is exactly what occurred here and, in support of this assertion, directs our attention to the following comments made by Murphy's counsel in his closing arguments to the jury:

> There will be a definition of damages -- of what's called 'compensatory damages.' And whatever you write in is right because that's our system. Whatever you put in is the right amount because you are the judge. I have a duty and I have a responsibility, as an advocate for Ms. Murphy, to tell you what I think you should write in.
>
> Because I think what was involved in this case is the dignity, the self-respect and the pride of a nurse that did the right thing. I'm going to suggest to you that with respect to those other damages, that you should award between 200- and $300,000. You may think that's too much. You may think that's too little. Whatever you decide is right. I'm asking you to do that because I think the dignity, the self-respect and the pride of somebody that stood up to do the right thing is worth a lot.

Although these comments seem to support El Paso Healthcare's assertion, they constitute nothing more than argument and cannot be invoked as proof that the jury's award was not fair and reasonable. More importantly, Murphy presented evidence from which the jury could have quantified the amount of loss suffered by her. She testified to the mental toll taken on her by the events surrounding her retaliatory discharge, and her testimony was uncontroverted. The reality

18

is that emotional pain, mental anguish, and inconvenience are difficult to quantify in monetary terms and that the jury has broad discretion to assign a specific dollar amount to compensate a person for these kinds of damages. *Saenz*, 925 S.W.2d at 614. Murphy's testimony was more than sufficient to support the conclusion that the amount of compensatory damages awarded to her is fair and reasonable. *Compare with Saenz*, 925 S.W.2d at 614 (concluding the jury's $250,000 award for mental anguish damages was not fair and reasonable because the only evidence found in the record was one question and one answer, which indicated that Saenz worried and that she believed she and her husband might lose their home and that they could not afford the medical bills).

El Paso Healthcare's third issue is overruled.

## ATTORNEY'S FEES

In its fourth issue, El Paso Healthcare takes umbrage with the trial court's award of $88,980 in trial attorney's fees and $162,500 in conditional appellate fees. El Paso Healthcare contends that Murphy is not entitled to recover attorney's fees incurred for services rendered on her claims for tortious interference with a contract and breach of contract. According to El Paso Healthcare:

> The legal services provided to advance the tortious interference and abandoned contract claims asserted prior to February 25, 2012[, the date when counsel performed initial research into the anti-retaliation statute and related rules and regulations,] did not also advance the retaliation claim. Those fees are not recoverable and must be excluded from the attorney's fees calculation.

We disagree.

### *Applicable Law*

A party may not recover attorney's fees unless authorized by statute or contract. *Gulf*

*States Utils. Co. v. Low*, 79 S.W.3d 561, 567 (Tex. 2002). As a general rule, when a lawsuit involves multiple claims, the party seeking attorney's fees must segregate recoverable from unrecoverable fees. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). But "[t]his standard does not require more precise proof for attorney's fees than for any other claims or expenses." *Id*. at 314. Accordingly, it is not necessary for an attorney to keep separate records documenting the exact amount of time spent pursuing one claim versus another to prove that the amount of attorney's fees sought is sufficiently segregated. *See id*. Rather, an attorney can satisfy his evidentiary burden by presenting evidence of unsegregated attorney's fees and a rough percentage of the amount attributable to the claims for which fees are not recoverable. *See id*. at 314 n.83.

### *Discussion*

Murphy adduced evidence segregating her recoverable attorney's fees from those not recoverable, as required by *Chapa*. Murphy's attorney presented evidence of unsegregated attorney's fees by testifying to the total hours spent on the case—164.8—and the hourly rate charged—$600.00. He also presented evidence of a rough percentage of the amount attributable to the claims for which fees were not recoverable by testifying as follows:

> As Your Honor knows, common law claims where narrowly you don't get attorney's fees in the case, I felt it appropriate to have some adjustment down to account for hours that would have spent only on common law claims. It's hard to be precise with that because work, for example, taking a deposition, you can't -- you know, there aren't questions specific to the common law claim and to the statutory claim.
>
> And so, by necessity, I think the best the lawyer can do is do an approximation. And so what I did is I reduced my hours by ten percent to account for matters that were exclusively for the common law claim. And so what that leaves is, after we make that ten percent adjustment, it leaves the total hours of recoverable to 148.3.

20

This testimony demonstrates that, in calculating the amount of attorney's fees owed, Murphy's attorney identified the percentage of time he spent on the claims on which he could not recover attorney's fees versus the percentage of time he spent advancing the claim on which she was entitled to recover her attorney's fees and discounted it accordingly.   Murphy thus conclusively established her entitlement to the attorney's fees awarded by the trial court.  *See Chapa*, 212 S.W.3d at 314 ("Chapa's attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of her petition; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim."); *Med. Specialist Group, P.A. v. Radiology Assocs., L.L.P.*, 171 S.W.3d 727, 738 (Tex.App.--Corpus Christi 2005, pet. denied)("In his affidavit, Radiology Associates' counsel . . . testified that his fees for the defense of the case totaled $460,087.00, and approximately forty percent of these fees were directly related to Saratoga's antitrust claims.").

Although Murphy satisfied *Chapa*'s evidentiary burden, El Paso Healthcare nonetheless relies on *Chapa* in arguing that, because the legal services rendered by Murphy's counsel did not advance all her claims, Murphy is not entitled to attorney's fees for work done before the date her retaliatory claim was filed, regardless if that work was necessary for the successful prosecution of that claim.   But *Chapa* does not stand for that proposition.   In fact, *Chapa* suggests the contrary:

> But [*Stewart Title Guar. Co. v.*] *Sterling* [, 822 S.W.2d 1 (Tex. 1991),] was certainly correct that many if not most legal fees in such cases cannot and need not be precisely allocated to one claim or the other.   Many of the services involved in preparing a contract or a DTPA claim for trial must still be incurred if tort claims are appended to it; adding the latter claims does not render the former services unrecoverable.   Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearing, *voir dire* of the jury, and a host of other services may be necessary whether a claim is filed alone or with others. To the extent such services would have been incurred on a recoverable

21

claim alone, they are not disallowed simply because they do double service. *Chapa*, 212 S.W.3d at 313. Further, we have found no authority supporting the notion that the date on which a claim is filed is the date on which the clock begins in calculating attorney's fees in a case. Accordingly, El Paso Healthcare has not shown the trial court erred in awarding Murphy $88,980 in trial attorney's fees.

El Paso Healthcare's fourth issue is overruled.

## CONCLUSION

The trial court's judge is affirmed.

June 27, 2015

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, J., and Parks, Judge
Parks, Judge (Sitting by assignment)(Not participating)

22